LEO MAYER & others [1] *vs.* BOSTON METROPOLITAN AIRPORT, INC. & others.

Middlesex.    December 3, 1968. — February 6, 1969.

Present: WILKINS, C.J., CUTTER, KIRK, SPIEGEL, & REARDON, JJ.

*Contract*, For sale of real estate, Option, Waiver, Performance and breach. *Waiver. Tender. Words*, "Advisable," "Other requirements."

An option to purchase land providing that "conveyance . . . [should] be made . . . at any time during the period of this [option] agreement" would not permit conveyance after the expiration of such period, irrespective of the time of notice of the exercise of the option.  [351–352]

In a suit in equity to establish the defendant's liability for alleged breach of an agreement giving the plaintiffs an option through February 1 to purchase land adjoining a municipal airport and reserving to the defendant the right to "exclude from any conveyance," with appropriate price reduction, unidentified parts of the land necessary to qualify the airport for Federal aid, and providing that "conveyance of the land . . . [should] be made . . . during the period of this agreement," a conclusion by a master that actions of the defendant "constituted a waiver" of its right to insist upon actual conveyance on or before February 1 was warranted by the master's subsidiary findings, including findings that on that date the defendant was notified of the exercise of the option and of a later date for passing papers, that before such later date the defendant sent the plaintiffs a copy of the proposed deed, which recited that it was given "pursuant to the terms of" the option agreement and which rightfully excluded a part of the option land, that the plaintiffs declared the proposed deed unacceptable but on the date for passing papers the defendant tendered it, and that the issue of the propriety of the exercise of the option was not raised then or previously.  [352–353]

In a suit in equity to establish the defendant's liability for alleged breach of an agreement giving the plaintiffs an option to purchase for a stated price per acre all or any part, subject to a certain minimum acreage, of a parcel of land adjacent to a municipal airport, and reserving to the defendant the right to "exclude from any conveyance" unidentified parts of the parcel necessary to qualify the airport

[1] The plaintiffs are joint venturers.  As holders of an option, they are assignees of Ray C. Johnson to whom, on February 1, 1960, they had assigned rights under the option agreement as extended.  They seek against defendants other than the airport corporation only to reach and apply certain of its assets.  The plaintiffs were the beneficial owners of land in Canton near the airport.

for Federal aid, with appropriate price reduction, where it appeared
that prior to the day fixed for conveyance the plaintiffs were advised
that the defendant would exclude a certain part of the parcel from the
conveyance under the exclusion provision, that on that day the de-
fendant offered a deed rightfully excluding such part, and that the
plaintiffs insisted that such deed was unacceptable and tendered
payment for the whole parcel, it was held that the plaintiffs' tender
did not put the defendant in default under the agreement. [355]
Under an agreement giving an option to purchase a large parcel of land of
the seller adjacent to a municipal airport operated by the seller and
providing that the seller should have "the right to (a) exclude from any
conveyance . . . such part of the land or (b) subject the land to such
suitable restrictions as may be necessary or advisable to comply with
. . . regulations or other requirements in order to qualify . . . for Fed-
eral aid for the development of the . . . [airport] or for the extension
of its runways," the seller rightfully excluded from a proffered convey-
ance, following exercise of the option, a part of the parcel lying in the
direct path of an extension of a runway, instead of merely imposing
restrictions on such part, and there was no breach of the agreement by
the seller in that it did not offer a conveyance of the whole parcel. [356]

BILL IN EQUITY filed in the Superior Court on April 26,
1960.

The suit was reported by *Ponte*, J., without decision.

*James D. St. Clair* (*Francis X. Meaney* with him) for the
plaintiffs.

*Henry P. Monaghan* for the Boston Metropolitan Airport,
Inc.

CUTTER, J.    The plaintiffs by their bill seek to establish
the liability of the principal defendant (BMA) for alleged
breaches of an option agreement and to reach and apply
assets of BMA (fn. 1).   The case was referred to a master.
His report was recommitted for further findings on the
issue of waiver of any requirement of actual conveyance
of the option land prior to February 1, 1960.   Thereafter
the master's original and supplemental reports were con-
firmed.   A Superior Court judge (see G. L. c. 214, § 31),
without decision, reserved and reported the case for the
determination of this court upon the pleadings, the master's
reports, and certain stipulations and exhibits.

Prior to 1954, BMA conveyed land to the town of Nor-
wood (the town) on which the latter built the Norwood
Municipal Airport (see attached plan).   BMA, since at

least 1942, has managed the airport under a written agree-
ment.    The agreement operative in 1960 was made in 1956.
It has title to land east, south, and west of the airport.

On February 1, 1954, BMA gave the plaintiffs a written
option [2] to acquire title to 249 acres of land west of the

---

[2] On the attached plan the area originally subject to the option appears
as the five parcels marked A, B, C, D, and E.    The option was to run through
February 1, 1955, with provision for extension for each of two additional
years by yearly payments of $2,500.    The plaintiffs could require conveyance
of all or any part of the option land, but not less than fifty contiguous acres,
for $350 an acre payable one half in cash and one half by a purchase mortgage
note.    The plaintiffs in 1956 and 1957 made payments to keep the option
alive.

Neponset River. By written agreement [3] on February 1, 1957, provision was made for extension of the option to February 1, 1960, subject to the making of annual payments of $2,500. BMA required insertion of a new provision (hereafter for convenience called the 1957 exclusion provision): "Provided however, that . . . [BMA] shall have the right to (a) exclude from any conveyance . . . such part of the land or (b) subject the land to such suitable restrictions as may be necessary or advisable to comply with rules, regulations or other requirements in order to qualify, or continue to qualify for eligibility for Federal aid for the development of the Norwood Airport or for the extension of its runways and in the event of such exclusion the purchase price shall be reduced by $350 for each acre or part thereof excluded." The 1957 extension agreement was prepared by Mr. Richard M. Russell, a director of BMA and its counsel.

H. E. Shaw, president of BMA, wrote on January 15, 1957, to Theodore A. Roselund, a plaintiff, that the airport might require "Control of or, if need be, acquisition of land off the ends of the runways . . . to comply with the '[C]lear [Z]one'[4] regulations to continue the eligibility for federal aid for airport development, or for runway extension." The Civil Aeronautics Administration (CAA, now the Federal Aviation Agency — FAA) prefers that the owner of an airport hold title to any clear zone required for its operation.[5]

---

[3] Article 3 of the original option agreement (prepared by the law office of one of the plaintiffs) provides in part: "*Conveyance* of the land . . . shall be made . . . *at any time during the period of this agreement or extension thereof* to the optionees [the plaintiffs] . . . upon request of the optionees, such request appointing the time and place for passing papers, for a total price computed at the rate of $350 . . . per acre for the total area . . ." (emphasis supplied).

[4] A clear zone is an area at the end of a runway from which buildings may be excluded or within which their height may be limited in order to permit safe landings and takeoffs. See *Loschi* v. *Massachusetts Port Authy.* 354 Mass. 53, 59, cert. den. 393 U. S. 854.

[5] CAA, however, issued on July 1, 1957, a statement of policy to the effect that an easement or covenant running with the land (giving the airport operator "sufficient control to clear the area of all obstructions" projecting above the approach surface) was an "adequate property interest" to protect clear zones. This policy is now part of 14 C. F. R. § 550.38.

During 1957 and 1958 BMA's representatives consulted with CAA regarding expansion and improvement of the Norwood Airport. Discussions included southward extension of the north-south runway and its clear zone, for which Federal aid to the town might be available, and enlarging the service facilities and building, for which, so the master found, Federal aid would not be available. See, however, fn. 7, last sentence.

Shortly before June 26, 1958, Roselund learned from Shaw that BMA contemplated reserving for these purposes about 149 out of the 249 acres subject to the option. Thereupon one of the plaintiffs wrote to Mr. Russell, BMA's counsel, asking for a reduction of the annual option price. Shaw replied by letter dated October 16, 1958, enclosing a map of the airport and the option land, which he had subdivided into parcels A, B, C, D and E, approximately as shown on the attached sketch plan. Shaw stated that BMA was not "free to sell" parcels D and E [6] until it was determined (a) "what approach zone limitations must be applied to parcel D," and (b) that "the sale of parcels D and E will have no bearing on the eligibility of the airport for Federal . . . or State aid." This determination, Shaw wrote, "is a matter to be decided . . . between the" town and CAA. The letter also stated BMA's desire to retain a fifty-foot perimeter strip along the northwest boundaries of parcels A, B, and C. Shaw also proposed that, after the purchase of parcels A, B, and C, the option privilege might be continued on parcels D and E at only $1,000 a year.

In the fall of 1959 the plaintiffs paid the full annual option payment of $2,500, bringing the total to $15,000. In late November, 1959, Carl A. Johnson, who had become BMA's president in place of Shaw, wrote to the plaintiffs that "as a result of conferences with [FAA] representatives . . . it has been determined that . . . parcels . . . 'D'

---

[6] Parcel D is south of the north-south runway in an area to which the proposed clear zone would extend. Parcel E is south of the administration building and west of the north-south runway and is described by the master as "a logical area for the expansion of the airport service area."

and 'E' . . . be entirely eliminated from . . . [the] option and that . . . it may be advisable at some subsequent date to place some restrictions on the development of some of the land easterly of the east-west runway."

The parties and counsel conferred in January, 1960. BMA did not, then or later, present to the plaintiffs written evidence of CAA's requirements justifying the exclusion of parcels D and E. On September 9, 1959, however, CAA's district airport engineer had written to Carl A. Johnson, president of BMA, that it was "strongly recommended that no land be disposed of, the development of which might jeopardize the safety of aircraft using the facility or limit the expansion of this important airport. The land south of the present Administration Building [apparently parcel E] and land at the ends of the N/S runway [which includes parcel D] should be retained for future expansion and clear zones. This also applies to the east end of the E/W runway [apparently parcel B]. The town . . . should also acquire sufficient property in the administrative area for adequate public use." [7] When no satisfactory agreement was reached about what could be excluded, BMA declined to give another extension of the option.

On February 1, 1960, Ray C. Johnson, as "assignee of the plaintiffs, delivered in hand to Carl A. Johnson . . . of BMA, a letter . . . [reading in part]: 'Having acquired an assignment of even date herewith . . . of an option given

---

[7] On March 22 ,1960, the president of BMA wrote to Reed of CAA that BMA's directors "had voted to exclude from any future sales . . . [parcel] D (so as to preserve· this area for the extension of the northwest-southeast runway in a southeasterly direction) and . . . [parcel] E (to allow for the expansion of other airport facilities)." On March 25, 1960, Reed's deputy commended the action as "a big step in the right direction," and urged that "the town . . . control . . . [parcel] D since this is in the clear zone at the southeast end of the NW/SE runway." Reed, as district airport engineer, was in charge for CAA or FAA of all airport activities in Massachusetts and the modification and improvement of existing airports there. His duties were largely advisory. He could not commit CAA or FAA to Federal aid. It would be necessary for the town, not BMA, to apply for aid. The town had not done so. Aid was available for the extension of runways and protection of clear zones, but not for the construction of service facilities and facilities contemplated for parcel E. The acquisition of land, however, needed for either a runway clear zone or for the proper operation of an airport may be the subject of Federal aid. 14 C. F. R. §§ 550.3 (b) (13), 550.24 (b) (2).

by . . . [BMA] to Theodore A. Roselund . . . [and others] dated February 1, 1954, as extended by an agreement . . . dated February 1, 1957, I hereby notify you of my decision to exercise . . . [the] option, papers to be passed pursuant thereto on April 1, 1960, at the Registry of Deeds at Dedham . . . at 10:30 A.M., unless another date, time and place are agreed to.'"

On March 28, 1960, Mr. Russell sent to counsel for the plaintiffs a copy of the deed (conveying only parcels A, B, and C, without the fifty-foot perimeter strip) which BMA proposed to tender on April 1, 1960. On March 31, 1960, the plaintiffs' counsel wrote to Mr. Russell that the proposed deed which excluded parcels D and E, and the fifty-foot strip, was unacceptable. Telephone discussions on March 31, 1960, were fruitless, and on April 1, 1960, both Mr. Russell and the plaintiffs' counsel appeared at the registry of deeds. "At no time, up to and including April 1, 1960, did Mr. Russell or anyone else on behalf of BMA object to . . . [that date and place] as being . . . acceptable . . . for the passing of papers under the option agreement as amended or contend that . . . [the] date was too late or not in accordance with the . . . agreement as amended."

At that time, Mr. Russell tendered (a) a deed from BMA to Ray C. Johnson of parcels A, B, and C, excluding the fifty-foot perimeter strip, and (b) the money to purchase necessary revenue stamps. Although the land was registered, Mr. Russell did not present the certificate of title, or a subdivision plan. The plaintiffs' counsel refused the tender on the ground (1) that the description in the deed did not cover all of the area to which the plaintiffs contended they were entitled, and (2) that no subdivision plan had been tendered. He made no specific objection at this time to the exclusion of the perimeter strip, or to the absence of the title certificate. The plaintiffs' counsel also tendered (a) a certified check for $43,575, one half of the purchase price for the full 249 acres, and (b) a mortgage and note to BMA for $43,575, each as specified in the original agreement. Mr. Russell refused this tender.

The master concluded (a) that Ray C. Johnson, as assignee of the option, by his letter of February 1, 1960, requesting conveyance on April 1, 1960, had properly exercised the option; (b) that BMA was justified in excluding parcel D from the land to be conveyed; (c) that BMA was not required to protect the clear zone merely by imposing restrictions on parcel D but could exclude the fee; (d) that BMA was not justified by the 1957 exclusion provision in refusing to convey parcel E and the fifty-foot perimeter strip; and (e) that the plaintiffs, if entitled to recover at all, had suffered damages of $135,100. In his supplemental report, the master concluded that the actions of Mr. Russell, as authorized representative of BMA, "constituted a waiver of . . . [BMA's right, if any] to insist" upon actual conveyance before February 1, 1960.

The trial judge, in reporting the case to this court without decision, stated eleven questions of law which he regarded as substantial. Our duty is to direct entry of the decree required by the whole record, after resolution of relevant issues of law. See *Dunlop* v. *Claussen*, 313 Mass. 715, 716–717. From the master's subsidiary findings we may draw inferences different from those drawn by him. He has set forth "all of the subsidiary findings upon which he bases an ultimate conclusion." See *Corrigan* v. *O'Brien*, 353 Mass. 341, 345–346.

1. The original agreement (fn. 3) provided that "[c]on-veyance shall be made . . . *at any time during the period of this agreement or extension thereof* . . . upon request . . . appointing the time and place for passing papers" (emphasis supplied). BMA contends (see *Cities Serv. Oil Co.* v. *National Shawmut Bank*, 342 Mass. 108, 110) that this provision required actual conveyance on or prior to February 1, 1960, when the option extension expired. The agreement expressly says that conveyance is to be made during the option period. In option contracts time ordinarily is of the essence. See *Donovan Motor Car Co.* v. *Niles*, 246 Mass. 106, 107; *Hunt* v. *Bassett*, 269 Mass. 298, 302; Corbin, Contracts, § 273; Williston, Contracts (3d ed.), § 853. See also *C. & W.*

*Dyeing & Cleaning Co. Inc.* v. *DeQuattro*, 344 Mass. 739, 741–742. The provision (fn. 3) does not permit either expressly or by implication, conveyance within a reasonable time after notice of the exercise of the option and after the expiration of the option. We, however, need not decide whether this case is governed by the *Cities Serv. Oil Co.* case, 342 Mass. 108 (cf. *Snelling* v. *Hall*, 107 Mass. 134, 138–139), in view of our decision concerning waiver in the next part of this opinion.

2. The subsidiary findings relevant on the issue of waiver have already been stated. The issue of the propriety of the exercise of the option first appears to have been raised by motion to amend BMA's answer on April 21, 1964, nearly four years after the filing of BMA's original answer. The issue was not expressly asserted either at or prior to the meeting at the registry of deeds on April 1, 1960. The deed tendered by Mr. Russell for BMA recited that it was given "pursuant to the terms of" the option agreement.

The master's report does not suggest that Mr. Russell ever (a) showed willingness to convey parcels D and E at any time after November, 1959, or (b) objected to conveying parcels A, B, and C (apart from a restriction possibly to be imposed on parcel B and except for the fifty-foot strip). As BMA was willing to convey the land included in the deed later offered, there was no occasion for Mr. Russell to insist, as to those parcels, upon the literal terms concerning exercise of the option. See *Colbert* v. *Hennessey*, 351 Mass. 131, 142, which may indicate the possibility of selective operation of a waiver. Even though BMA did not insist at once after February 1, 1960, that the option had not been exercised in accordance with its terms, the subsidiary findings do not require the conclusion that either BMA or Mr. Russell had voluntarily relinquished any known basis of objecting to the conveyance of parcels D and E, or that BMA by any act had become estopped to assert any objection at a later date.[8] See *Rose* v. *Regan*, 344 Mass. 223,

---

[8] All these matters took place about a year prior to the decision of the *Cities Serv. Oil Co.* case, 342 Mass. 108, on February 14, 1961.

229.  See also *Scammell* v. *Ouston*, [1941] A. C. 251, 267–268; Corbin, Contracts, § 762.

Ordinarily, however, whether a waiver has taken place involves the decision of issues of fact.  See *Cueroni* v. *Coburnville Garage, Inc.* 315 Mass. 135, 138; *MacDonald & Payne Mach. Co. Inc.* v. *Metallic Arts of New England, Inc.* 324 Mass. 353, 356–357.  See also *Simons* v. *American Dry Ginger Ale Co. Inc.* 335 Mass. 521, 526.  Mr. Russell's somewhat ambiguous actions after February 1, 1960, could be interpreted as acquiescence in the view that the February 1 letter required BMA to convey at least some land pursuant to the option as, in effect, was recited in the tendered deed of parcels A, B, and C.  The plaintiffs, in preparing for the closing, could be found to have relied on Mr. Russell's actions (a) as asserting only that the 1957 exclusion provision relieved BMA from obligation to convey parcels D and E and the perimeter strip, and (b) as a waiver of any inadequacy in the letter of February 1, 1960, as an exercise of the option.  We cannot say that the master's conclusions on waiver, based upon his subsidiary findings, were not justified.

3. On April 1, 1960, Mr. Russell for BMA was insisting upon conveying only parcels A, B, and C, less the fifty-foot perimeter strip.  The plaintiffs' counsel was insisting that a "deed which excluded parcels D and E and the . . . strip was unacceptable."  At the registry of deeds the plaintiffs tendered payment for the whole property, and thus were demanding lot D which the master found BMA was entitled to exclude from the conveyance (see part 4 of this opinion, *infra*).  BMA offered a deed only of parcels A, B, and C, without the perimeter strip, and thus did not include parcel E and the strip, both of which the master found could not properly be excluded under the 1957 exclusion provision. BMA failed also to produce a subdivision plan and the original registered land certificate of title, which the master found BMA was bound to supply.

The minor defects in BMA's tender (absence of a subdivision plan and of the certificate of title) and comparable minor defects in the plaintiffs' tender (if there were any)

may be disregarded. See *Schilling* v. *Levin*, 328 Mass. 2, 5. Each party had known in advance the insistent position of the other and therefore any tender was probably futile.

The actual meeting on April 1, 1960, as we read the subsidiary findings, amounted to little more than formal reiteration of positions which the parties had theretofore been taking. There was no showing on either side (see *Marlowe* v. *O'Brien*, 321 Mass. 384, 386) of a "readiness to perform" on April 1, 1960, upon what the master found was the proper basis, nor was either purported tender coupled with an offer to perform on that basis. See Corbin, Contracts, § 978. Cf. *LeBlanc* v. *Molloy*, 335 Mass. 636, 638. The issue thus is whether the substantive tender (each not in conformity with the option agreement as interpreted by the master) of BMA or the plaintiffs was sufficient to cause non-acceptance of the tender by the other party to constitute a material breach of contract.

In a contract for the conveyance of land the performance by the seller (giving the deed) and the buyer's return performance of paying the price are to be simultaneous. See *Hunt* v. *Bassett*, 269 Mass. 298, 302; *Rigs* v. *Sokol*, 318 Mass. 337, 344; *American Oil Co.* v. *Cherubini*, 351 Mass. 581, 585; Restatement: Contracts, § 267; Corbin, Contracts, § 656, p. 144. It is the general rule "that when performance under a contract is concurrent, one party cannot put the other in default unless he is ready, able, and willing to perform and has manifested this by some offer of performance" although a tender of performance is not necessary "if the other party has shown that he cannot or will not perform." See *Leigh* v. *Rule*, 331 Mass. 664, 668; *Vander Realty Co. Inc.* v. *Gabriel*, 334 Mass. 267, 270–271. See also *Siegel* v. *Shaw*, 337 Mass. 170, 175; *Zerner* v. *White*, 350 Mass. 773, 774. Because each party, in effect, indicated to the other (up to and through the meeting on April 1, 1960) unwillingness to perform on the basis which the master found was required, neither could or did "accrue rights under the contract" (see *Bruni* v. *Andre*, 339 Mass. 708, 711). See Corbin, Contracts, § 1258; Williston, Contracts (3d ed.) § 832,

pp. 96–100. See also *Hapgood* v. *Shaw*, 105 Mass. 276, 279; *Brown* v. *Slee*, 103 U. S. 828, 837; *Wimer* v. *Wagner*, 323 Mo. 1156, 1167. The plaintiffs, who now seek to recover damages, have not established that they were ready and willing (a) to pay the stipulated price, computed on a basis of $350 an acre, for the land which the master found BMA was bound to convey, and (b) to accept a conveyance only of those parcels. Their purported exercise of the option on February 1, 1960, did not indicate (as it could have done with respect to a contiguous parcel of fifty acres or more, fn. 2) willingness to accept less than all the option land. Their tender, calling for a counter performance by BMA exceeding (at least as to parcel D) what the master found BMA was bound to convey, did not put BMA in default. See *Kattor* v. *Adams*, 323 Mass. 686, 688–689; Corbin, Contracts, § 1233, p. 520.[9] See also *Steelduct Co.* v. *Henger-Seltzer Co.* 26 Cal. 2d 634, 646; *Lewis* v. *James*, 134 Cal. App. 2d 15, 21; *Hambleton* v. *U. Aja Granite Co.* 96 Vt. 199, 203. Cf. *Hamilton* v. *McLaughlin*, 145 Mass. 20, 22. Cf. also *Doody* v. *Collins*, 223 Mass. 332, 334; *Trahant* v. *Perry*, 253 Mass. 486, 489.

4. The 1957 exclusion provision gave BMA (emphasis supplied) "the right to (a) exclude . . . such part of the land *or* (b) subject the land to such suitable restrictions as may be necessary *or advisable* to comply with . . . regulations *or other requirements* in order to qualify, or continue to qualify, for eligibility for Federal aid for the *development of the . . . airport* or for the *extension of its runways*." The word "advisable" indicates that BMA was given a range of discretion. The words "other requirements," used in addition to the word "regulations," suggest that an exclusion may be supported by Federal provisions less formal than published regulations (e.g. administrative determina-

---

[9] Nothing requires us to decide whether the plaintiffs could have ascertained just what portions of the option land BMA was entitled to retain under the 1957 exclusion provision. The plaintiffs did not seek declaratory relief or specific performance, or establish (so far as the master's findings reveal) that they were ready and willing to accept conveyance of only as much of the option land as BMA was bound to convey.

tions with respect to this airport). The references to "development of the airport" and "extension of its runways" show that exclusions were to be permitted to preserve the possibility of Federal aid to create an expanded airport and not merely to improve the airport within its 1957–1960 limits. The alternatives of exclusion "or" restriction we regard as allowing either method of protection.

We now consider the provision only in relation to the exclusion of parcel D. The purpose of the 1957 exclusion provision with respect to any extension of the north-south runway would be impeded, if not defeated, if parcel D could not be excluded. As the attached sketch plan shows, that parcel lies in the direct path of a southward extension of the north-south runway, reasonably to be expected in a period when airplanes are increasing in speed and size. Mere restriction of the height of structures on parcel D would not be enough to permit extension of the runway over it. Only retention of the parcel by BMA, so that it could be transferred to the town, would preserve the possibility of that runway extension.

The master correctly concluded that the 1957 exclusion provision gave BMA "the right to elect either to retain the fee [in parcel D] or to submit the area to restrictions." Not only was outright control of parcel D essential to any substantial runway extension, but anything less would be likely to afford inadequate protection of the clear zone for the existing runway. The CAA, so the master found, "would prefer that the owner of an airport also hold title to any 'clear zone' required for its operation," although it permitted other forms of control. This CAA preference in itself (notwithstanding the CAA policy concerning restrictions, see fn. 5, *supra*) justifies the BMA decision that it would be "advisable" to retain the fee in parcel D. BMA was not obliged to rest its decision on Federal minimum requirements for protecting the existing runway.[10]

---

[10] The plaintiffs suggest that BMA's conduct in excluding parcel D to protect an extension of the north-south runway is inconsistent with its willingness to convey that part of parcel B which is in the clear zone of the east-west runway. We do not speculate why, in the one case, BMA insisted on

It is not material whether BMA was under any obligation to transfer parcel D to the town in the absence of eminent domain proceedings. The obvious purpose of the 1957 exclusion provision was to protect the town's interest in the airport, a public interest with which BMA, as well as the town, was closely concerned because of its 1956 management agreement with the town.

Our decision (that neither the plaintiffs nor BMA had established willingness on April 1, 1960, to perform on the basis correctly excluding parcel D) makes it unnecessary to consider whether, under the 1957 exclusion provision (somewhat ambiguous, particularly in its application to parcel E), BMA was also entitled to exclude parcel E because of its significance to airport development and the possibility of Federal aid to the town for the acquisition of land for some airport uses (see fns. 6, 7, last sentence). There is, of course, no occasion to consider any issue of damages.

5. The trial judge acted within his discretion (see *S. D. Shaw & Sons, Inc.* v. *Joseph Rugo, Inc.* 343 Mass. 635, 639–640) in refusing to recommit the master's report so that there might be attached to it certain designated letters between BMA and CAA officials. These letters the plaintiffs have reprinted in their brief. To some extent the correspondence was summarized, or referred to, in the master's report. Although the affidavits in support of the motion to recommit did not require that it be granted, the correspondence printed by the plaintiffs in their brief has been examined. Nothing in it leads us to any different conclusion on any controlling issue.

6. A final decree is to be entered in the Superior Court dismissing the bill.

*So ordered.*

---

reserving a fee in parcel D, and, in the other case, was content with conveying parcel B "subject to . . . [s]uch restricted use as may be imposed by authorized governmental agencies in connection with the use of the East/West runway." BMA, as we interpret the 1957 exclusion provision, was entitled to adopt either course.