**In re DATA CONCEPTS INTERNATIONAL, INC., Data Concepts Incorporated, Rockford Research, Inc., Debtors.**

**Robert CATALDO, Trustee of Data Concepts, Inc., Plaintiff,**

**v.**

**The CONTINENTAL INSURANCE COMPANY, Defendant.**

**Bankruptcy Nos. 84–300–JG, 84–485–JG and 84–486–JG.**
**Adv. No. 84–357–JG.**

United States Bankruptcy Court, D. Massachusetts.

April 28, 1987.

Mark G. DeGiacomo, Roche, Carens & DeGiacomo, Boston, Mass., for plaintiff.

Thomas V. Urmy, Jr., and Janice Kelley Rowan, Warner & Stackpole, Boston, Mass., for defendant.

## MEMORANDUM

JAMES N. GABRIEL, Chief Judge.

The matter before the Court is the adversary complaint filed, on November 30, 1984, by the Trustee of Data Concepts, Incorporated ("DCI" or the "Debtor") against The Continental Insurance Company ("Continental" or the "defendant"). Through his two count complaint, the Trustee seeks to recover $551,676. The Trustee's claim is based upon an agreement entered into by DCI and Continental on September 9, 1983 and referred to as the Letter of Intent. Continental denies that it owes the Debtor monies pursuant to the Letter of Intent or in quantum meruit. This court conducted a trial on September 29, 1986 and September 30, 1986 and heard oral argument on February 2, 1987.

## FACTS

DCI was founded in the mid–1970's. Until it filed a voluntary Chapter 7 petition on April 6, 1984, DCI was in the business of developing and licensing a software system known as the Data Conveyor System. DCI's licensees were large insurance companies such as Allstate and American Mutual. Insurance companies licensed the Data Conveyor System because it was designed to meet the insurance industry's need for a computer system to quote and write business insurance policies effectively and at a reasonable cost.

The Data Conveyor System is made up of a software package known as SIMPL!E. It originally was written in DCI's proprietary computer language known as TRAC. TRAC was written in yet another computer language known as ASSEMBLY or Assembler language. Significantly, the Assembler language used by DCI could only be used on a Texas Instruments computer known as the Model 990.

In June of 1982, DCI and Continental entered into the first of a series of agreements. The first agreement, which was preliminary in nature, was dated June 8, 1982. It was known as the Evaluation License and Service Agreement. Pursuant to that agreement, which was to remain in force no more than 30 days, Continental was permitted to run tests on the standard form of the Data Conveyor System for the purpose of determining whether it wanted to enter into a full license agreement. In return, DCI commenced customization of the Data Conveyor System for Continental's policy types and rate structures, developed bridge software and commenced training of designated Continental employees. Subsequently, the term of the agreement was extended to August 8, 1982. However, the parties continued to undertake evaluation and customization work through January of 1983, long after the expiration of the agreement.

In February of 1983, Continental entered into a License Agreement with DCI. The License Agreement gave Continental a non-exclusive license to use the Data Conveyor System software in consideration for a one-time payment of $261,280, plus monthly usage fees. The License Agreement also provided for the payment by Continental of certain "inducement" fees pertaining to the conversion and migration of the Data Conveyor System to "C" language. "C" language, as opposed to Assembler language,

is an industry standard that is available on many different manufacturers' hardware. By converting the Data Conveyor System to "C" language, DCI could expand the use of its software on hardware systems other than the Texas Instruments Model 990.

Specifically, Article III of Exhibit B to the License Agreement, entitled " 'C' Language Conversion" provided in relevant part:

DCI believes that converting the TRAC System for the Assembler Language of the host hardware to "C" language will enhance the applicability of the Data Conveyor System and provide certain other advantages to customers who use the System with "C" language based equipment systems. Continental believes that said conversion will allow improved flexibility in taking advantage of advances in hardware technology and provide certain other advantages to Continental. DCI, at the request of Continental, has therefore *accelerated the internal development project* initially intended to translate the TRAC System into "C" language within nine (9) months.

(emphasis supplied).

Article III continued:

In order to induce DCI to commit to conducting its Conversion Project at a specific ongoing level of effort and skill, Continental has agreed to pay DCI the sum of $30,000 (the "Commitment Fee") in consideration of which DCI agrees as follows:

(a) To use only full time DCI employees on the Conversion Project, which employees shall possess appropriate levels of skill to pursue the project in a competent manner.

(b) To devote at least 35 manhours per week to the Conversion Project.

(c) To use its best efforts to complete the Conversion Project by April 1, 1983.

Continental also agreed to pay DCI another $25,000 to migrate or adapt the "C" language version of the Data Conveyor System to new computer hardware to be selected by Continental. The Agreement then provided: "If the hardware is selected [by Continental] by April 1, 1983, DCI shall use its best efforts to modify and deliver to Continental a Data Conveyor System for said hardware by August 1, 1983." Additionally, Article III provided for a refund by DCI to Continental if 1) "after opportunity for testing and reasonable opportunity for correction of the converted system, the said converted system does not perform at least as well as the Data Conveyor System as delivered for use on the TI [Texas Instruments] 990/12;" or 2) Continental did not use the converted system. Continental also agreed "to provide at its expense all required hardware and related support services at DCI's premises for the "C" Hardware for so long as DCI is engaged in the Migration project...."

Following the execution of the License Agreement, the parties conducted business in accordance with its terms. Continental paid the required fees, and DCI, with the involvement of Continental employees, continued the "C" language conversion. During the summer of 1983, however, DCI's financial situation began to deteriorate. On June 27, 1983, DCI's Executive Vice President and co-founder Andrew P. Diamond ("Diamond") wrote to Gordon Gilchrest ("Gilchrest"), Continental's Vice-President, Systems Technology Division, proposing the payment of a one-time license fee to take the place of monthly fees for the SIMPL!E Development and Maintenance License, terminal charges and fees for agents' terminals. Ideally, a paid-up license would provide DCI with a much needed infusion of cash, whereas, for Continental, such a license would eliminate concern for increased monthly fees. Continental did not respond immediately to Diamond's June proposal. However, on July 1, 1983, three months after the date identified in the License Agreement, it informed Diamond that it had chosen Hewlett Packard's HP 9000 super-micro computer as the vehicle for DCI's software system.

By August of 1983, DCI's financial situation had worsened. Following a meeting on August 12, 1983, Diamond, on August 13, 1983, wrote to Gilchrest again proposing "various paid-up license options." Dia-

mond's written proposal identified eleven items which Continental could obtain by payment of discounted paid-up license fees and/or customization charges. Diamond, in his letter, indicated that:

Standard license fees for all items amount to $1,706,700. The total amount of the individual Discounted License Fees if acquired individually is $1,103,535. If individual items are selected, Discounted License Fees will apply. If five items are selected, an additional discount of 15% can be applied. If all items are selected, a 25% discount can be applied reducing the total amount of [sic] $827,-651.

\* \* \* \* \* \*

Customizing charges amounting to $710,-600 are not subject to discount.

During the trial, Diamond testified about his August 13, 1983 letter. He indicated that for a one time lump sum discounted fee of $275,975, Continental could obtain the right to use all the computer functions that Continental had acquired under the License Agreement and that for an additional $551,676 Continental could acquire a number of additional functions to which it had no rights under the License Agreement.

Continental did not respond directly to Diamond's August 13th proposal that technically expired on August 26, 1983. Rather, on September 9, 1983, the parties executed a Letter of Intent, described by Diamond as a "preliminary agreement to enable Continental to acquire software at a reduced price." The Letter of Intent provided in relevant part:

This Letter of Intent sets forth in principal the terms of a proposal by DCI to permit Continental to pay all license fees now or hereafter payable under the existing agreement between DCI and Continental for a discounted paid up license fee of $827,651. *Such fee would cover charges relating to the functional capabilities of the Data Conveyor System as presented in the letter of Andy Diamond dated August 13, 1983 and attached hereto....*

\* \* \* \* \* \*

This Letter of Intent sets forth only the present intention of the parties hereto and is not intended to constitute a binding legal obligation of any such party with respect to any term or provision hereof except with respect to the obligation of Continental to pay to DCI $275,975 upon execution of the Letter of Intent and except as provided in the last sentence of this paragraph. Upon execution of this Letter of Intent, the parties hereto will promptly enter into negotiations with a view toward execution of a definitive agreement relating to the subject matter hereof on or before October 15, 1983. If such an agreement is not executed on or before that date, either party may terminate negotiations at any time thereafter, DCI may retain a [sic] $275,975 paid to it hereunder, and Continental shall be under no further obligation to pay charges pursuant to its existing agreement with DCI or otherwise, relating to any use by Continental, on or after October 1, 1983, of the Data Conveyor System in its Production or Implementation mode, as defined in the present agreement between the parties.

The Letter of Intent contained three conditions: 1) execution of a definitive agreement on or before October 15, 1983; 2) approval and evidence of DCI acquiring $1.7 million in financing exclusive of any financing obtained through Continental; and 3) satisfactory delivery of the "C" conversion on Hewlett Packard hardware by February 15, 1984. Significantly, the parties are in disagreement as to whether or not the three conditions apply to the Letter of Intent as a whole or whether the conditions are tied to the payment structure set forth in the Letter of Intent so that evidence of financing was a condition for the payment of $151,676 and delivery and satisfactory performance of the "C" conversion was a condition for the payment of $400,-000. There is no question that Continental was obligated to and did in fact pay $275,-975 upon the execution of the Letter of Intent.

Following the execution of the Letter of Intent, DCI forwarded a draft of a pro-

posed agreement to Continental. Diamond testified that Continental did not respond to the draft. He indicated that he made "casual inquiries" of Continental during the fall of 1983.[1] However, he also indicated that he was reluctant to press Continental with respect to an amendment to the License Agreement because DCI had not obtained the $1.7 million in financing and that he was attempting to convince Continental to make an equity investment in DCI. Indeed, in January, 1984, representatives of DCI and Continental met with investment bankers in New York City to attempt to raise equity capital.

Despite DCI's inability to obtain financing, on or about November 15, 1983, DCI sent Continental an invoice for $151,675. Continental, through its Assistant Secretary and Associate Corporate Counsel, Richard A. Robbins ("Robbins"), responded by letter dated November 29, 1983. Robbins stated: "I am sure you will understand that, unfortunately, since Continental is presently under no contractual or other obligation to your company with respect to such sum, it will not be able to authorize such payment."

Despite this information, DCI, in conjunction with Continental employees who were provided with an apartment near DCI's headquarters, continued to work on the "C" conversion project, using the Hewlett-Packard computer furnished by Continental. At the end of December 1983 or the beginning of January 1984, Continental furnished DCI with the 50 test policies. Continental later accepted delivery of the software containing the "C" conversion and tested it on or around February 24, 1984. In an interoffice memo, dated March 2, 1984, that contained the minutes of a February 29, 1984 meeting, Richard A. Chapman ("Chapman"), Continental's Commercial Lines Manager, reported that "DCI has completed the 'C' conversion and the 'C' version performs equal to or better than the TI [Texas Instruments] version."

Thereafter, on February 27, 1984, Diamond wrote to Continental requesting payment of $400,000.

In the March 2nd memo, Chapman indicated that Continental's obligation to pay DCI was evaluated from three aspects:

a. *Legal*—Apparently no legal obligation.

b. *Business*—There is no overriding business reason to pay the money....

c. *Moral/Ethical*—There were differing opinions on this aspect of the question.

The September 9, 1983 Letter of Intent generated a considerable amount of correspondence in addition to the interoffice memo circulated among Continental managers. In a memo to S. Smith, a Senior Vice President at Continental, Gilchrest revealed 1) that payment of $827,651 was authorized by "P & C [Property and Casualty] management and that he was to negotiate the terms and conditions of the commitment;" 2) that "without a working version of the system in "C" language, Continental would really have nothing if DCI were to close its doors;" 3) that the $151,676 payment was due to be paid around October 15, 1983, and it was conditioned upon DCI acquiring $1.7 million in financing, and 4) that if the second payment of $151,676 was paid Continental would be further obligated to pay the $400,000 upon the delivery of the "C" language.

In a January 25, 1984 letter to Gilchrest, Diamond emphasized that DCI's initial agreement to provide Continental with the "C" conversion was on a "best efforts" basis. According to Diamond, "[t]he willingness of DCI to incorporate a refund provision in this contract reflects the fact that DCI was undertaking the "C" migration project at that time only as an internal project and was willing to risk a small finite amount of monies, i.e., $55,000, if the project was unsuccessful." With respect

---

1. For example, Gilchrest in an interoffice memo dated January 4, 1984, to J.J. DeSalvo, Assistant Vice President, stated "I received a call from Andy Diamond ... [h]e asked about the status of the draft of the contract revisions. I related

to him Rick Robbin's comment that the draft needed a lot of work ... [and] that he was putting the contractual issues on hold until the question of DCI's financial viability was decided."

to the Letter of Intent and the objective criteria to be used to determine acceptance of the "C" conversion, Diamond suggested that DCI would have abandoned the project if it thought Continental was not serious about the amendment to the License Agreement. He stated:

> [f]rom Data Concepts' point of view, we never would have entered into an agreement such as this. While we need the funds, our maximum exposure was limited to $55,000. Why should we ever risk another $400,000? *This was particularly true when these funds were not even being paid for the actual migration expense but for license fees.*

(emphasis supplied)

In the January 25, 1984 letter, Diamond also recognized that Continental had imposed additional conditions with respect to DCI's proposal. He noted that Continental had responded to his August 13, 1984 proposal "with a proposal which incorporated several additional conditions, i.e., receipt of $1.7 million in additional funding *and* completion of the migration project." (emphasis supplied).

## DISCUSSION

As a preliminary matter, Massachusetts adheres to the general rule that where the terms of a contract are unambiguous, parole evidence is not admissible to add to, contradict or vary the terms of the agreement. *Liberty Mutual Insurance Co. v. Gibbs*, 773 F.2d 15, 17 (1st Cir.1985) ("Where the wording of a contract is unambiguous, the contract must be enforced according to its terms."); *see also Concord Auto Auction Inc. v. Rustin*, 627 F.Supp. 1526, 1528 (D.Mass.1986).

With respect to the Letter of Intent, neither party has advocated its interpretation without resort to the testimony and exhibits introduced during the course of the two day trial. Indeed, both parties introduced evidence to explain the Letter of Intent and neither party objected to the submission of self-serving documents essentially interpreting the September 9th document.

Although the Court finds that the key provision of the Letter of Intent—the ability of either party to terminate negotiations without further obligation in the absence of the execution a definitive agreement by October 15, 1983—is unambiguous, parole and documentary evidence introduced by the parties clearly facilitate an understanding of the context of the agreement and the intentions of the parties, particularly in view of the technical nature of the subject matter. As a consequence, the Court has considered all the evidence submitted to it.

Counsel to Continental, in his closing arguments, admitted that Continental probably would have continued to do business with DCI after the completion of the "C" Language Conversion if DCI had been able to obtain the requisite financing. Indeed, prior to the execution of the Letter of Intent, the conduct of the parties evidences a lack of concern for strict adherence to established time tables. The picture that emerges from the testimony, exhibits and arguments of counsel is one of a large company essentially "stringing" DCI along. Clearly, if DCI could have obtained additional financing, there was a likelihood that it would have been able to develop new functions for Continental and at least help Continental solve its short term computer software needs at a time when Continental's long range plans were being developed. As a consequence, Continental employees took no clear and unequivocal steps to dispel Diamond's "expectations" that if the "C" conversion was completed, Continental would pay DCI $400,000. Indeed, it was "business as usual" with respect to the interactions between DCI and Continental technical personnel working on the "C" conversion project. Thus, it is obvious to the Court that Continental may well have had an ethical obligation to compensate DCI. However, the question remains as to whether Continental had a legal obligation to pay DCI, and, if so, in what amount.

■ The Trustee argues that the estate is entitled to $551,676 ($151,676 plus $400,000) pursuant to the Letter of Intent because when neither party terminated negotiations, the Letter of Intent became a binding contract. The Letter of Intent does not

contain a notice of termination requirement. It merely states that if the parties are unable to negotiate a definitive agreement by October 15, 1983, "either party may terminate negotiations at any time thereafter." The Trustee maintains that the Letter of Intent became a legally binding agreement because neither party terminated negotiations before or after October 15, 1983. The Court is unpersuaded by the Trustee's reasoning because the plain language of the Letter of Intent provides that it was "not intended to constitute a legally binding obligation ... with respect to any term or provision ... except with respect to the obligation of Continental to pay DCI $275,975 ... and except as provided in the last sentence of this paragraph." The sentence referred to is the sentence previously quoted that provides that "either party *may* terminate negotiations" and that "DCI may retain ... $275,975 paid to it ... and Continental *shall* be under no further obligation to pay charges pursuant to its existing agreement with DCI or otherwise...." (emphasis supplied).

The Court reiterates its finding that the language of the Letter of Intent is unambiguous with respect to the ability of either party to terminate the agreement. In the Court's view, it is clear that if negotiations did not result in a definite agreement the parties, after October 15, 1983, were under no further contractual obligation to one another. As the court in *In re Harvey Probber, Inc.*, 50 B.R. 292, 296 (Bankr.D. Mass.1985), indicated: "When the parties have not agreed to essential terms of the contract and intend to draw up a final written agreement in the future, the parties are generally considered to have reached the stage of 'imperfect negotiation' and not a completed contract." *See also Rosenfield v. United States Trust Co.*, 290 Mass. 210, 217, 195 N.E. 323 (1935) ("[I]t would seem that the parties agreed on certain fundamental terms of the proposed lease, with an implied understanding that others were to be settled later by mutual agreement. An agreement to reach an agreement is a contradiction in terms and imposes no obligation on the parties thereto."); *Wilcox v. Shell Eastern Petroleum Products, Inc.*, 283 Mass. 383, 387, 186 N.E. 562 (1933) ("The fact that the parties agreed in the instrument that there should be a later formal contract, while not conclusive ... tends to indicate the intent that their final contract was to be the binding expression of all their completed negotiations.").

Diamond's testimony and his letter of January 25, 1984, in which he clearly establishes the parameters of the agreement reached between DCI and Continental on September 9, 1983, lend support for the interpretation of the Letter of Intent as an agreement to agree. Specifically, Diamond admitted that the Letter of Intent was preliminary in nature and was subject to two conditions beside the execution of a definitive agreement, namely, acquisition of $1.7 million in financing and completion of the "C" language conversion and migration project. Additionally, in the same letter, he acknowledged that the payment of $400,000 was for license fees and not for the actual migration expense. DCI does not and cannot deny that the additional $1.7 million in financing was not obtained and that additional functions were not provided. Therefore, in the absence of a waiver or an estoppel or an implied contract, Continental is correct in asserting that it is under no legal obligation to DCI irrespective of the fact that DCI performed its pre-existing obligations with respect to the "C" language conversion and migration project.

The Trustee also argues that even if the Court were to find that the Letter of Intent terminated on October 15, 1983, the plaintiff is entitled to recover on any one of four alternative theories: 1) Continental waived the termination clause; 2) Continental is estopped from claiming the protection of the termination clause; 3) Continental is bound by a new express contract, the terms of which would be identical as far as performance and payment requirements with the Letter of Intent; and 4) Continental is bound by an implied contract arising between the parties. The Trustee adds that if the Court finds that a binding agreement existed, the evidence established that DCI

timely delivered the converted software and that that software passed the fifty policy test set forth in the Letter of Intent. The Trustee also asserts that the $1.7 million financing condition and the execution of a new agreement were conditions applicable to the $151,676 payment only and that Continental waived those conditions. Accordingly, the Trustee argues the estate is entitled to the $151,676 payment as well as the $400,000 payment.

■ With respect to the Trustee's waiver argument, the Court notes that the evidence belies his position. To repeat, Diamond acknowledged that DCI failed to live up to two of the three conditions imposed by the Letter of Intent: 1) the execution of a final agreement with respect to items left open in the Letter of Intent, and 2) receipt of $1.7 million in additional financing. Furthermore, there is no merit to the argument that Continental waived those conditions in view of the Robbins' letter of November 29, 1983 to Diamond, in which Robbins expressly stated: "Continental is presently under no contractual or other obligation to your company...."

A waiver is the unconditional relinquishment of a known right. *In re Idak Corp.*, 19 B.R. 765, 770 n. 7 (Bankr.D.Mass.1982) *Niagara Fire Insurance Co. v. Lowell Trucking Corp.*, 316 Mass. 652, 657, 56 N.E.2d 28 (1964). The determination of whether a waiver has taken place involves resolution of factual questions. *Mayer v. Boston Metropolitan Airport, Inc.*, 355 Mass. 344, 353, 244 N.E.2d 568 (1969). The Court is unable to find from the evidence before it that Continental waived either its right to terminate the Letter of Intent or the conditions that a new express agreement be executed and additional financing obtained.

■ With respect to the Trustee's estoppel argument, the Massachusetts Supreme Court has defined the parameters of the doctrine as follows:

'[I]n order to work an estoppel it must appear that one has been induced by the conduct of another to do something different from what otherwise would have been done and which resulted to his harm and that the other knew or had reasonable cause to know that such consequence might follow. But the doctrine of estoppel is not applied except when to refuse it would be inequitable.'

*Corea v. Board of Assessors of Bedford,* 384 Mass. 809, 427 N.E.2d 925 (1981). In view of Robbins' November 29, 1983 letter, the Court is not persuaded that Continental should be estopped from arguing that the Letter of Intent terminated as of October 15, 1983. The Court notes that DCI's decision to continue work on the "C" language conversion, though motivated by Diamond's "expectation" that DCI would be paid $400,000, was already mandated by the terms of the original License Agreement. Although Diamond testified that he would have canceled work on the "C" language conversion if he had known DCI would not be paid under the Letter of Intent, the Court is unable to conclude that DCI's efforts to complete the "C" language conversions amounted to "something different from what otherwise would have been done" because the "C" language conversion would have expanded the market for DCI's software and benefited DCI, at least as much if not more so than Continental. (See Article III of Exhibit B to the License Agreement). Moreover, the Court cannot find that DCI was justified in relying on Continental's promise to pay $400,000 upon completion of the "C" language conversion because Diamond admitted that the $400,000 payment was not for the "C" conversion itself but for new functions and because the "C" language conversion had been paid for already by Continental pursuant to the License Agreement. (See Article III of Exhibit B to the License Agreement).

■ This same rationale applies to defeat the Trustee's argument that an implied-in-fact contract arose between the parties. Under Massachusetts law, the claimant, in order to recover on an implied-in-fact contract must show that it performed services with a reasonable expectation of payment for them and the defendant knew or had reason to know that payment was expected. *General Dynamic Corp. v. Federal Pacific Electric Compa-*

*ny,* 20 Mass.App.Ct. 677, 683, 482 N.E.2d 824 (1985). The principal function of contracts implied-in-law is to prevent unjust enrichment. When applicable, the remedy is the exclusive source of a recovery for the claimant. *See generally,* J. Calamari and J. Perillo, *Contracts* § 1–12 (1970). "[R]ecovery on a theory of contract implied in law is not permitted, at least in the absence of bad faith, where an express contract covers the same subject." *In re D. Frederico Co., Inc.,* 8 B.R. 888 (D.Mass. 1981); *see also Randolph v. New England Mutual Life Insurance Co.,* 526 F.2d 1383 (6th Cir.1975). Since Continental had paid for the "C" language conversion, DCI, to be entitled to a recovery under an implied-in-fact contract, would have to have demonstrated that it provided Continental with the additional functions identified in Diamond's letter of August 13, 1983. This it failed to do.

■ Finally, the Court observes that even if the Trustee were correct in its position that the Letter of Intent was not terminated and constituted an executory contract between the parties at the commencement of the case the Trustee did not move to assume the contract by August 20, 1984, the date set by Judge Caffrey as the date by which the Trustee had to assume or reject the agreement. *Cf.* 11 U.S.C. § 365(d)(1).[2] Therefore, DCI's contract with Continental was rejected as a matter of law on August 20, 1984.

In view of the foregoing, the Court enters judgment for Continental and against DCI.

So Ordered.

---

**2.** DCI, Data Concepts International, Inc. and Rockford Research, Inc. are consolidated cases. The docket in case no. 83–300 reveals that, on June 5, 1984, Chief Judge Caffrey of the District Court entered an order extending the time within which the Trustee had to assume or reject executory contracts up to and including August 20, 1984. Parenthetically, at the time Judge Caffrey's order was entered the Bankruptcy Amendments and Federal Judgeship Act of 1984 had not been enacted.