MARY LOSCHI & others *vs.* MASSACHUSETTS PORT
AUTHORITY.

Suffolk.  February 5, 1968. — March 11, 1968.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, & KIRK, JJ.

*Logan International Airport. Eminent Domain,* Validity of taking, Air-
    port. *Parks. Equity Jurisdiction,* Parks. *Equity Pleading and Prac-
    tice,* Parties.

St. 1963, c. 410, empowered the Massachusetts Port Authority, operating
    the Logan International Airport, to take by eminent domain real estate
    located "westerly of the present property line of" the airport where
    it appeared that such acquisition was "a part of" an agreement be-
    tween the Authority and the Federal Aviation Agency contemplating
    an extension of an existing runway of the airport over land already
    available for airport use, and that such acquisition was necessary to
    meet Federal requirements for protection of an aerial approach to the
    runway as extended, although it had not been necessary before the
    extension.  [59–60]
Landowners in the neighborhood of park land had no standing to attack
    use of the park for the purposes of the Logan International Airport.
    [60].

BILL IN EQUITY filed in the Superior Court on January 19,
1966.

The suit was heard by *Beaudreau,* J., on a demurrer and
on a master's report.

*Vincent J. Celeste* for the plaintiffs.

*Donald R. Grant* for the defendant.

CUTTER, J.  Owners of land in East Boston seek de-
claratory relief concerning the Authority's eminent do-
main takings (by order of August 8, 1963) of land near
Neptune Road, East Boston, for the Logan International
Airport.  Their principal contention is that the Authority
has taken land lying "westerly of the present property line
of the . . . [a]irport" in violation of St. 1963, c. 410.  An
appeal from an interlocutory decree sustaining the Au-

thority's demurrer now presents only the issue whether the plaintiffs have standing to question the use of Wood Island Park (mentioned below) for airport purposes. A master's report on other phases of the case was confirmed. By final decree, it was declared that the properties mentioned in the order of August 8, 1963, were validly taken, as permitted by St. 1963, c. 410, "for the purpose of protecting the aerial approaches" to Runway 15–33 "in accordance with applicable federal standards," and "for the purpose of meeting runway clear zone requirements of the federal government." The plaintiffs appealed.

The Authority is responsible for the "control, operation and maintenance" of the airport. St. 1956, c. 465, § 5. It may "extend . . . [and] improve . . . the projects under its control" and may acquire by purchase or by eminent domain under G. L. c. 79 "such . . . lands . . . as it may deem necessary for carrying out the provisions of" the 1956 statute. See c. 465, § 3 (g) and (k). The Authority's powers are to be construed liberally. *Massachusetts Port Authy.* v. *Clerk of the East Boston Dist. Court,* 350 Mass. 195, 202. By St. 1963, c. 410, it was provided that the Authority "shall not, *except for* [A] *the purpose of protecting the aerial approaches to runways in accordance with applicable federal standards,* [B] *meeting runway clear zone requirements of the federal government,* providing for the installation of navigational and landing aids required by the federal government, or [C] *meeting other air safety requirements of the federal government,* acquire by the exercise of the power of eminent domain for airport purposes any land above mean high water in the East Boston district of the city of Boston [D] *westerly of the present property line* of the . . . [a]irport . . ." (emphasis supplied).[1]

The area in East Boston (near and at the airport), concerning which this controversy arises, is shown on the

---

[1] The letters in brackets are inserted for convenience of reference to the italicized language following such letters. Statute 1963, c. 410, was repealed by St. 1964, c. 383, § 1, but in respects here pertinent was substantially reënacted by c. 383, § 2. The italicized language remained unchanged from the 1963 statute.

Loschi *v.* Massachusetts Port Authority.

accompanying plan. The plaintiffs owned land (marked by a bracketed [B] at the left side of the plan) on the southwest side of Neptune Road. Neptune Road is separated from the main airport runways by World War Memorial Park, also known as Wood Island Park (marked [C] on the plan),[2] and by an area of tidal water (marked [E] on the plan). At the right of the plan appears the northwest end (marked [A] on the plan) of present Runway 15–33. This runway now extends southeast from the point marked [A] for a distance of 7,873 feet, to a southeasterly terminus, shown by the exhibits to be only a few hundred feet from the water's edge of Boston harbor and from the airport boundary. The paved surface of Runway 15–33 is 150 feet wide. It is used for instrument landings of turbo-jet aircraft.[3]

In 1962 and 1963, and in prior years, the Authority studied the possibility of extending Runway 15–33 so that it would be 10,000 feet long. The master found that this "extension contemplated an additional paved runway of" 2,127 feet. Exhibits indicate that this extension (shown as [D] on the plan) is to be made "over tidal flats" at the northwest end of the existing runway (from about point [A] shown on the plan to a line shown as [F]) to near the present high water line of the shoutheasterly shoreline of Wood Island Park.[4] Filling of the tidal flats in the harbor area (marked [E] on the plan) will be required and some fill already has been placed. Thus no property now or formerly belonging to these plaintiffs, and no taking of land not already owned by the Commonwealth or by the Authority, will be required "to extend physically . . . Runway 15–33 to a length of" 10,000 feet.

[2] The master and the parties have referred to the park as Wood Island Park as do we.

[3] The main runways of the airport are mostly south and east of the area shown in the plan. The air terminal is southwest of Wood Island Park at a point beyond the area shown on the plan.

[4] Because the actual extension of Runway 15–33 was not to go northwest of the high water mark at Wood Island Park, only use of tidal area (and some airport land east of the tidal area) was involved. It was stipulated orally at the arguments, in effect, that any obstacles, presented by 1939 harbor lines (existing prior to 1966), to filling the flats in the tidal area (marked [E] on the plan) were removed by St. 1966, c. 733, §§ 1, 2.

The Authority has removed a bridge providing access from Neptune Road to Wood Island Park and has constructed a fence which removes the park "effectively from public use for recreational purposes." Trees in the park have been cleared. Statute 1953, c. 528, provided that control of the park should be in the Metropolitan District Commission "until such time as the governor and council, upon request of the state airport management board, directs its transfer to said board for airport purposes." See St. 1955, c. 438. No actual or intended use of the park area for physical extension of the runway is proposed now, although use of the park will be required for a "clear zone" (a matter discussed later in this opinion) when the runway is extended.

On October 31, 1961, the Authority made a request for Federal aid for its 1962 development program, including an item for property acquisition for approach, protection, and clearing in connection with Runway 15–33. On May 31, 1963, the Authority made an application (amended in June, 1963) "bearing upon a '1963 Grant-in-Aid Program'" containing a land acquisition "for Runway 15 Clear Zone." Both the 1961 and the 1963 proposed acquisitions included properties on Neptune Road then owned by the plaintiffs. A grant offer was made by the Federal Aviation Agency (FAA) to the Authority on June 28, 1963. This was accepted on June 28, 1963. The accepted grant offer thus became an agreement between the Authority and FAA (the 1963 grant agreement). See 49 U. S. C. § 1111 (1964); Federal Aviation Regs. § 151.31. The 1963 grant agreement provided that the Authority would not commence certain work on the property acquisition project until plans had been approved by FAA.[5] The master found (a) that

[5] A 1965 plan in evidence, approved by the Authority and by FAA, shows the 2,127 foot extension, but it is not shown that this 1965 plan bears direct relationship to the 1963 grant agreement. It does appear, however, that "extension of [R.]unway 15–33 was divided into three phases," and that a contract for phase I involving a commitment of $509,052 has been awarded, but not completed because of the harbor lines problem now solved by the enactment of St. 1966, c. 733 (fn. 4, *supra*). That the general scheme of extending and protecting the runway has FAA approval is sufficiently apparent from the master's report and various exhibits.

apart from the 1963 grant agreement, there was no obligation on the part of the Authority to extend Runway 15–33, but (b) that the acquisition of the plaintiffs' properties became "a part of . . . [the 1963] grant agreement." He also found that from "an aviation viewpoint, the . . . extension of [R]unway 15–33 was and is . . . desirable," and that "the removal of structures on . . . Neptune Road would provide a greater factor of safety for all concerned."

Federal regulations [6] dealing with the Federal Aid to Airports Program require, in connection with Federal grants,[7] the acquisition, control, or protection of so called "runway clear zones" which are designed "to allow the unobstructed passage of aircraft landing or taking off from a runway." The master found that the plaintiffs' parcels on Neptune Road are all beyond a 2,500 foot "clear zone" from the present paved 7,873 foot Runway 15–33. These parcels, however, will be within a "clear zone" of 2,500 feet for Runway 15–33, if and when it is extended northwesterly as proposed (i.e. to point [F] shown on the annexed plan). The master justifiably concluded that "the structures upon the [plaintiffs'] premises, . . . [on] Neptune Road, do not constitute an obstruction to aviation within . . . applicable federal standards as . . . Runway 15–33 exists presently at a length of 7,873 feet, but that . . . [such] structures would constitute an obstruction . . . to aerial navigation, within . . . applicable federal standards, if and when . . . Runway 15–33 may be extended" to 10,000 feet.

---

[6] See 49 U. S. C. § 1101 et seq. (1964), and 14 CFR (1967) §§ 151.7 (a), 151.9, and 151.11 (c). The regulations refer to Technical Standard Order N18 (TSO–N18) which provides that "an approach area" is 10,000 feet long "beginning 200 feet outward from the end of each runway and extending outward," ending 10,200 feet from the end of the runway. For "instrument runways" like Runway 15–33, there are special requirements.

[7] By the Federal statutes, the following principles are established. (1) Among the types of airport development contemplated is "acquisition of land . . . necessary to . . . mitigate . . . airport hazards," see § 1101 (3). (2) The administrator (to ensure, among other things, that the aerial approaches to an airport will be adequately cleared) "shall prescribe such . . . requirements . . . as he may deem necessary," see § 1110. (3) The administrator shall approve a project "only if he is satisfied that the project . . . will contribute to the accomplishment of the purposes of the" Federal statute. See § 1108 (d).

1. The master's report (although more restricted in its discussion of negotiations for the runway extension than would have been helpful) and the accompanying exhibits adequately establish that the Authority has long planned extending Runway 15–33 to 10,000 feet and that such an extension in a northwesterly direction can be done without taking by eminent domain land near Neptune Road or elsewhere for actual runway construction. Chapter 410 did not forbid extending the paved section of Runway 15–33 to the northwest over land which did not have to be taken by eminent domain after the effective date of c. 410. Nothing in c. 410 prohibited building a runway upon tidal flats of the Commonwealth or upon Wood Island Park, held for potential airport use at the discretion of the Governor and Council. See St. 1953, c. 528. Such an extension is plainly within the Authority's broad, general powers under St. 1956, c. 465.

Statute 1963, c. 410 (see fn. 1, *supra*, and related text of this opinion), by its exceptions (see italicized language at points [A], [B], and [C]), expressly permitted the Authority to make eminent domain takings, even "westerly of the present property line of the . . . [a]irport" (see point [D] of c. 410, as quoted) to meet Federal safety requirements and standards. No language confined the exceptions in c. 410 to existing runways. We see no justification for inserting in c. 410, by implication, language thus confining the exceptions. We interpret c. 410 as permitting the Authority to take land "westerly of the [airport's] present property line" to protect "the aerial approaches" to new or extended runways as well as to protect approaches to existing runways.

Examination of the 1963 grant agreement, and of the papers and exhibits leading up to it, shows that the purpose of the Neptune Road land acquisitions was to protect the aerial approach to Runway 15–33 from the northwest, and that this purpose was approved by FAA as sufficiently improving aviation safety and operations to justify Federal aid under the statutes already cited (see fn. 7). The require-

ments of the 1963 grant agreement that the land be acquired, taken with the project of extending the runway, bring the takings ordered on August 8, 1963, within the exceptions to the prohibitions of St. 1963, c. 410.

2. The trial judge sustained the Authority's demurrer on two grounds, viz. (1) that (with respect to paragraphs of the bill pertinent to this issue) the plaintiffs have no standing in equity to question the Authority's use of Wood Island Park; and (2) that the plaintiffs have no standing to question the filling of tidal flats in violation of the 1939 harbor line, now changed by St. 1966, c. 733. The second ground of demurrer is no longer in issue (see fn. 4, *supra*) because of c. 733. We thus discuss only the first ground of demurrer.

The plaintiffs allege no facts, as giving them standing in this proceeding to seek equitable relief concerning Wood Island Park, other than their ownership of land on or near Neptune Road, references to the statutes concerning the park (St. 1949, c. 431; St. 1953, c. 528; St. 1955, c. 438), and statements that the Authority has cut off access to the park and has done, or proposes to do, construction work there. The proper public officer to protect park land by bill in equity is the Attorney General.[8] See *Jacobson* v. *Parks & Recreation Commn. of Boston,* 345 Mass. 641, 644. See also *Cabot* v. *Assessors of Boston,* 335 Mass. 53, 57–58; *Nickols* v. *Commissioners of Middlesex County,* 341 Mass. 13, 16–18 (in which, however, relief by mandamus was granted to enforce the trust there considered, see pp. 18–19, 27). Cf. *Gould* v. *Greylock Reservation Commn.* 350 Mass. 410 (mandamus). Under principles stated in the cases just cited, the demurrer was properly sustained on the first ground.

3. The Authority contends that this court should deal with certain matters not covered by the final decree. We

[8] The Attorney General is not a party to this case. Although the docket shows that a former Attorney General filed a motion on February 10, 1966, for leave to intervene as a party defendant, it does not appear that the motion was allowed.

think that decision of these issues is not necessary to terminate the controversy.

(a) The Authority suggests that the lands on Neptune Road taken by it do not lie "westerly of the present [airport] property line" within the meaning of St. 1963, c. 410 (see fn. 1, *supra,* and related text of this opinion).[9]   Because we have concluded that the Authority's 1963 takings were proper under c. 410 in any event, we see no occasion for resolving now any ambiguity which may exist in c. 410 and its application to the airport property lines.

(b) There is also now no occasion, because we hold that the 1963 takings were valid, to determine whether the plaintiffs have standing in this proceeding to question their validity.   For like reasons, we see no occasion to decide whether the plaintiffs (who certainly have long been vigorously protesting the Authority's proposals) are barred by laches.

4. The interlocutory decree, sustaining the Authority's demurrer on the first ground asserted, and the final decree are affirmed.

*So ordered.*

---

[9] The quoted language from c. 410 is far from clear as applied to the Neptune Road area.   From some of the exhibits, this area appears to be almost an enclave surrounded on three sides by airport land (see the annexed plan). It is northeast of some airport property, and southwest of other airport property.   The master found that the record (apart from plans in evidence) contained "no transcripts of title or other sufficient evidence warranting determination of . . . the property lines of . . . [the a]irport."