King, J.
INTRODUCTION
Airport Impact Relief, Inc. (AIR), Friends of Belle Isle Marsh, Inc. (Friends) and twelve individual plaintiffs bring this action to compel the defendant Massachusetts Port Authority (Massport) to comply with certain obligations under the Logan Airport Modernization Program Mitigation Agreement (the Mitigation Agreement), which was executed in conjunction with a 1.4-billion-dollar expansion and modernization construction plan for Logan Airport. Massport executed the Mitigation Agreement with AIR, Friends, and the town of Winthrop on June 30, 1993. Although Massport’s Board of Directors has never formally disavowed the Mitigation Agreement, Massport’s Executive Director contends that the Mitigation Agreement is illegal and has refused to fulfill significant portions of Massport’s obligations under it. For this reason, this action was commenced to compel Massport to comply with the Mitigation Agreement. AIR and Friends now move for partial summary judgment seeking a declaration that the agreement is valid and enforceable and specific performance of those provisions under which they claim Massport is in default (counts I-III).[2] AIR, Friends and the twelve individual plaintiffs also move for summary judgment on count IV of the second amended complaint that alleges violations of the Massachusetts Environmental Policy Act (MEPA), G.L.c. 30, §§61-62H, and 301 CMR 11.00 et seq. The plaintiffs seek to enjoin Massport’s airport capacity enhancement study which they claim is proceeding in violation of MEPA. Massport brings a cross-motion for summary judgment on all counts of the second amended complaint.[3] A hearing on these motions was held on January 5, 1995. The court has considered the detailed summary judgment stipulations, all materials relating to the motions, and the arguments of counsel. For the following reasons, AIR’s and Friend’s motion for partial summary judgment is allowed as to counts I-III but is denied as to count IV. Massport’s cross-motion for summary judgment on counts I-III is denied, and Massport’s cross-motion for summary judgment is allowed as to count IV.
BACKGROUND The Parties
Massport is a body politic and corporate created by St. 1956, c. 465 (the Enabling Act). Massport owns and operates Logan International Airport (Logan Airport). Massport’s activities are directed by an Executive Director who reports to a seven-member Board of Directors. Board members serve seven-year terms by appointment of the governor. The terms of board members are staggered.[4]
AIR is a nonprofit corporation existing under G.L.c. 180. At all times relevant hereto, AIR had 26 members (21 active and 5 inactive) among whom eight served as members of the Board of Directors.
Friends is a nonprofit corporation existing under G.L.c. 180. At all times relevant hereto, Friends had approximately 200 members, including 12 who serve as members of the Board of Directors or as committee chairs entitled to vote as Directors.
History of the Environmental Mitigation Program
In July of 1993 Massport published a Final Generic Environmental Impact Report (the Final GEIR) in accordance with their obligations under MEPA.[5],[6] The Final GEIR is a prospective planning mechanism to evaluate the environmental impact of Massport Programs and Policy Changes, the Final GEIR is designed to: “analyze changes in environmental impacts related to airside and groundside activities; develop shortterm and longterm mitigation plans to offset the environmental impacts of airport activities; and provide comprehensive, longterm assessment of the environmental effects of passenger volume growth and a context within which the effects of individual mod *654 ernization projects can be understood and reviewed.” Final GEIR, p. 1-8 (July 15, 1993). The following facts relating to the Final GEIR are not in dispute and are taken from that document.
Over the past several decades, the effects of Logan Airport’s activities upon neighboring residential areas has led to increasing community participation in the airport planning process. Discussions between the community and Massport about the future of the airport resulted in the development and adoption of the 1976 Logan Airport Master Plan, which established policies on physical growth and development at the airport. The 1976 Master Plan stated that Massport would provide technical assistance to communily groups, where appropriate. The Master Plan continues to guide planning for Logan Airport and has helped form the framework for subsequent environmental mitigation initiatives such as the noise rules, the school and residential soundproofing programs, and the Preferential Runway Advisory System (PRAS), among others.
In 1987, Massport initiated the Logan Growth and Impact Control (LOGIC) Study to determine whether it was possible to keep Logan Airport impacts at or below 1987 levels. As a result of the LOGIC study, Massport determined that, with appropriate mitigation, it could keep airport related impacts at or below the 1987 level for scenarios involving 45 million annual passengers (which is the level projected to occur in 2010). At present Logan Airport accommodates about 21 million annual passengers.
On April 27, 1988, the Secretary of Environmental Affairs issued a revised Scope to govern the content of the next Logan Airport GEIR. Massport submitted a draft of the next GEIR in December 1991.
Massport also established the Community Working Group (CWG) in 1991 to participate in the modernization of Logan Airport. AIR and Friends were both represented in the CWG which reviewed the Draft GEIR during a sixty-day period after its submission.
Federal and state agencies also reviewed the draft GEIR and on March 2, 1992, the Secretary of Environmental Affairs issued a Certificate of Adequacy. The Certificate requested that Massport identify impact areas and acceptable levels of impact and that Massport determine appropriate mitigation measures to meet these goals.
On June 29, 1993, a majority of the Massport board voted to adopt the Final GEIR which responded to the directives in the Certificate by detailing a broad array of mitigation actions including the following:[7]
Ground Transportation—
Reduce vehicle trips per air passenger;
Improve infrastructure at four intersections in East
Boston;
Manage traffic on community streets by holding
constant or decreasing vehicle trips;
Conduct various feasibility studies of other traffic related measures.
Air Quality—
Pursue reduced engine taxiing for inbound aircraft;
Control emissions from fleet vehicles;
Install vapor recovery systems for fuel storage and handling equipment;
Evaluate energy sources for the power plant.
Noise—
Expand current residential sound insulation program to treat at least 400 homes a year;
Reduce nighttime noise through:
—Considering the feasibility of extending the Noise Rules defined nighttime hours from 11:00 PM - 7:00 AM to 10:00 PM - 7:00 AM,
—Reducing nighttime noise levels from commuter aircraft over close-in communities through working with the FAA to evaluate new flight tracks, and—
Working with the FAA to achieve use of preferential runways for nighttime activity.
—Supporting relocation of some cargo activity to other airports,
Investigating low-frequency noise and monitoring prescribed flight corridors using the new Noise Monitoring System;
Working with the FAA to evaluate a new flight corridor for departures from Runway 9 to reduce exposure over Point Shirley;
Reducing exposure from aircraft ground noise to nearby residential areas through studying the feasibility of new taxiway hold points for departures on Runway 22L; and
Improving compliance through working with the FAA to achieve overall Preferential Runway Advisory System (PRAS) runway utilization goals and flight procedures.
The Final GEIR commits Massport to a host of water quality mitigation measures as well.
Execution of Mitigation Agreement
The Mitigation Agreement was executed on June 30, 1993 by AIR, Friends, the Town of Winthrop and Massport, by its Executive Director, Alden Raine. The term of the Agreement is from June 30, 1993 through December 31, 2010, or until the annual passenger volume at Logan Airport reaches 45 million passengers, whichever occurs earlier.
In March of 1993, AIR, Friends, Winthrop and six other community organizations began a series of formal negotiations with Massport toward the execution of an agreement to mitigate various environmental impacts of airport operation upon the primarily low- and moderate-income residents of its host communities of East Boston and Winthrop.
*655 At a Massport Board meeting on June 29, 1993, Massport’s Executive Director, Alden Raine, recommended that the Board vote to authorize execution of the Mitigation Agreement. After discussion in Executive Session, and following Raine’s recommendation, four board members, Chairman Richard Giesser, Charles Raso, Frederick Salvucci and Carolyn Partan, voted to authorize execution of the Mitigation Agreement.[8] Members Cronin and Carangelo abstained, and member Card voted no.
At the time Mr. Raine executed the Mitigation Agreement in behalf of Massport, six community organizations other than AIR and Friends had not executed the Mitigation Agreement. Those six other organizations never agreed to execute, and did not execute, the Mitigation Agreement. The six community organizations refused to sign the Mitigation Agreement because they believed the Mitigation Agreement did not provide the local communities with sufficient protection against the likely adverse environmental impact of Massport’s expansion plans. The Mitigation Agreement signed by AIR and Friends is not contingent upon the participation of the six community groups who did not sign.
The following accurately identifies the seven members of Massport’s Board of Directors, along with the name of the Governor who appointed each and their respective terms, as of May, 1993, before Massport, Friends or AIR had committed to executing the Agreement.
Term Expires Board Member Appointed By
6/30/93 1. Charles M. Raso M. Dukakis
6/30/94 2. Jacqueline Smith M. Dukakis
6/30/95 3. Richard Giesser (Chairman) M. Dukakis
4. Carolyn P. Partan M. Dukakis 6/30/96
5. Frederick P. Salvucci M. Dukakis 6/30/97
6. PaulW. Cronin W. Weld 6/30/98
7. James Carangelo W. Weld 6/30/99
By May of 1993, it was publicly known that Mr. Raso’s term of office would expire on June 30, 1993 and that Governor Weld was considering the appointment of George Cashman as Mr. Raso’s replacement.
On May 24,1993, Jacqueline Smith, a Board member appointed by Governor Dukakis and whose term was to expire at the end of June, 1994, died. Her death meant that Governor Weld immediately could make his third appointment to the seven-member Massport Board of Directors, to be followed by Governor Weld’s fourth appointment at the expiration of Mr. Raso’s term on June 30, 1993. On June 27, Governor Weld appointed Kathleen Card to replace Ms. Smith. The first Board meeting Ms. Card attended was on June 29, 1993.
After Ms. Smith’s death, it became known to some of the membership of AIR and Friends, including the persons they had appointed to represent and counsel them in negotiating the Mitigation Agreement with Massport, that Governor Weld would, because of his right to make his fourth appointment to the Massport Board on July 1, 1993, then be in a position to propose that the Massport Board replace Alden Raine with a different Executive Director. Governor Weld’s intent to ask the Board to replace Mr. Raine with Stephen P. Tocco, Massport’s current Executive Director, was reported in local newspapers in May and June of 1993.
After Ms. Smith’s death, the negotiators for AIR and Friends, and some other members of AIR and Friends, believed that the June 1993 Board meeting, to be held late in the month, would be the last Board meeting held (in the foreseeable future) in which a majority of Massport’s board members had been appointed by Governor Dukakis, and that as of the following Board meeting a majority of Massport’s Board members would be appointees of Governor Weld.
After Jacqueline Smith’s death, Massport’s Executive Director, Alden Raine, communicated to AIR and Friends his desire to attempt to obtain approval by the then-current Massport Board to execute the Mitigation Agreement.
At a meeting of the community and Massport negotiators on May 28, 1993, Charles DeWitt, Jr., formerly Massport’s Chief Legal Counsel and one of Massport’s negotiators, advised the community negotiators that Alden Raine, Massport’s Executive Director, wanted to seek authorization from the then-current Massport Board (Le., with Mr. Raso still on the Board) to go forward with the Mitigation Agreement.
On June 9, 1993, at a meeting of its Board of Directors, AIR authorized its President to execute the Mitigation Agreement upon the recommendation of Jean Riesman, and subject to certain other provisions. The attendance sheet from the June 9 Air meeting, reflects the presence of ten members of AIR at the meeting, out of a total of 26 (21 active and 5 inactive) members of AIR. Of the ten members present, four were then members of AIR’s Board of Directors, out of a total of eight Board members.[9]
Some of the reasons why AIR and Friends agreed to execute the Mitigation Agreement when they did were the following: the likely change in Board composition at Massport to one in which four of seven Board members were to be appointed by Governor Weld; the change in staff at Massport which would likely result from the Board change; the uncertainties which those changes might cause with respect to implementation of the series of Massport initiatives to resolve community issues resulting from the impacts of Logan Airport; the importance of establishing a stable and predictable policy framework to guide Massport/community relations at the time Massport was bringing forward and beginning to implement a major program of Airport development and modernization; the importance of ensuring that, over the long term as such development and modernization progressed, there would remain in place a mechanism for guiding Massport actions, community participation, and dispute resolution, notwithstanding future changes over time in the personnel at Massport and in other agen *656 cies who would help review and develop Massport actions with respect to Logan Airport issues.
At its regularly scheduled monthly meeting on July 27, 1993, Massport’s Board voted to appoint Stephen P. Tocco as Executive Director of Massport effective as of August 16, 1993. Four board members (Cashman, Card, Cronin and Carangelo) voted in favor of the appointment. Member Salvucci voted no, member Giesser abstained, and Member Partan was not present. Mr. Tocco assumed his duties as Executive Director on August 16, 1993.
Events After Execution of the Mitigation Agreement
The parties stipulated to numerous actions taken by Massport that comply with certain of its obligations under the Mitigation Agreement and these are set forth fully in the parties’ summary judgment stipulation.[10] As to those actions, Massport was obligated under the terms of the Final GEIR to take those actions independent of its obligations under the Mitigation Agreement. Indeed, Massport was obligated by the Final GEIR to take many of the actions required by the Mitigation Agreement.
There is no dispute that Massport has refused to take those actions required by the Mitigation Agreement which are not required by the Final GEIR. Specifically Massport has not:
Completed by the required dates the studies or evaluations of indoor air pollution, low frequency noise, sleep disturbance, changes in arrival and departure procedures, expansion of restricted hours for engine run-ups, requiring private vehicles bound for Terminals B or C to use commercial parking facilities, establishing aircraft taxiing procedures to reduce aircraft engine emissions, jet engine odors and soot, and reviewed the scope of these studies with AIR and Friends as required;
Provided the results of noise monitoring to AIR and Friends every four months;
Conducted the rule-making by December 31, 1993 to expand the hours of Massport’s rule regarding late night aircraft restrictions;
Allowed the public to participate in the study of Runway 14/32 being done by Jason M. Cortell & Associates, Inc.;
Submitted to the Federal Aviation Administration (FAA) the proposed revisions to the Preferential Runway Advisory System;
Monitored and recorded compliance with FAA flight procedures and reported the results to the CWG;
Established an interagency task force to coordinate local traffic issues;
Made payments to the community foundation;
Appointed Massport’s representative to the foundation;
Provided facilities for a day care center;
Provided technical and legal assistance funds to the CWG created under the Mitigation Agreement, and approved the bank depository.[11]
DISCUSSION
Summary judgment shall be granted where (1) there are no material facts in dispute and (2) the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating these elements. Pederson v. Time. Inc., 404 Mass. 14, 16-17 (1989). A party moving for summary judgment who does not have the burden of proof at trial, may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the opponent’s case or “by demonstrating that proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass. 805 (1991), accord, Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). “If the moving parly establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat [the] motion.” Pederson, supra, 404 Mass, at 17. “]T]he opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment.” LaLonde v. Eissner, 405 Mass. 207, 209 (1989).
I. Enforceability of the Mitigation Agreement
Massport urges the court to rule that the Mitigation Agreement is unenforceable as a matter of law because it attempts to bind “future” or “successor” Massport boards in pursuance of essential governmental functions. It argues further that the Mitigation Agreement should be declared invalid because it saddles Massport with onerous and inflexible constraints over 17 years thereby stripping “subsequent boards” of their own policy making responsibilities.[12]
AIR and Friends, on the other hand, contend that the Mitigation Agreement is enforceable as a valid contract. They argue that Massport’s power to enter into the agreement is derived from Massport’s Enabing Act, St. 1956 c. 465.[13] The material undisputed facts provide no basis to invalidate the agreement.
A. Authority of the Board to Contract for Massport
Massport’s enabling statute expresses the unambiguous intent of the Legislature to create a single, continuous board. Under St. 1956 c. 465, Massport was created as “a body politic and corporate . . .” St. 1956 c. 465, §2. The section further provides that “the Authority shall consist of seven members all of whom shall be appointed by the governor . ..’’ and that “(n]ot more than four of the members shall be of the same political party . . .” Id. The section also mandates that *657 the seven-member board be appointed for staggered terms expiring on successive June thirtieths. Id.
The court is not persuaded by Massport’s argument that the agreement is unenforceable on its face because it binds “future” Massport boards. The staggered terms provision was plainly intended to ensure the board’s continuous, perpetual existence. Had the Legislature intended for the board to be periodically formed anew, it would have said so. See e.g., Sterilite Corp. v. Continental Casualty Co., 397 Mass. 837, 839 & n.3 (1986) (court will not read into a statute a provision which the Legislature did not see fit to put there).
The court is not aware of any provision in the enabling legislation suggesting that a given composition of a Massport board may be constrained to act where such action might interfere with the policy making functions of “future” or “successor” boards.
On the contrary, the Enabling Act gives Massport broad powers consistent with the court’s view of it as an ongoing entity. See e.g., Interface Group Inc. v. Massachusetts Port Auth’y, 631 F.Supp. 483, 489 (D.Mass. 1986), affd in part, vacated in part on other grounds, 816 F.2d 9, 13 (1st Cir. 1987) (Legislature confirmed breadth of Massport’s authority when it gave Massport power ‘to contract with any person’ desiring to use the airport); Loschi v. Massachusetts Port Auth’y 354 Mass. 53, 54 (1968) (Massport is empowered to take certain land by eminent domain). Section 3(g) authorizes Massport “(t]o extend, enlarge, improve, rehabilitate ... maintain, repair and operate the projects under its control, and to establish rules and regulations for the use of any such project . . .” St. 1956 c. 465, §3(g). Section 3(o) gives Massport the power “(t]o make and enter into all contracts and agreements necessary or incidental to the performance of its duties and the execution of its powers under this act.” St. 1956 c. 465, §3(o). Section 3(p) authorizes Massport to “do all acts and things necessary or convenient to carry out the powers expressly granted in this act.” St. 1956 c. 465, §3(p).[14]
In its brief, Massport cites 10A Eugene McQuillan, Municipal Corporations, §29.101 to support its contention that, in general, “the hands of successors cannot be tied by contracts relating to governmental matters.” The argument is unavailing. That same treatise, two pages later, states that:
[w]here a municipal body is a board or commission, the terms of the members of which are staggered, it is a continuous body, existing in perpetuity; and contracts of such a body cannot be deemed to bind or restrict successors in office.
10A Eugene McQuillan, Municipal Corporations, §29.101 at 44 (3d ed. 1990).
The Massachusetts cases relied on by Massport are similarly inapposite. Massport relies principally on Labor Relations Comm’n v. Board of Selectmen of Dracut, 374 Mass. 619 (1978), and Duggan v. City of Taunton, 360 Mass. 644, 646-652 (1971),[15] for the proposition that governmental entities may not bind future boards in the performance of governmental functions.
The Dracut decision involved a petition by the Labor Relations Commission to enforce an order requiring the town and the board of selectmen to implement a collective bargaining agreement that had been negotiated by three selectmen prior to the enlargement of the board to five selectmen. Dracut, 374 Mass, at 620-626. The court in Dracut concluded that “elected successor public officials cannot be required to endorse publicly the terms of a collective bargaining agreement negotiated by their predecessors.” Dracut, 374 Mass, at 626 (emphasis added).
The board in the instant case is not an elected board as it was in Dracut, but a staggered and appointed one. The difference is material, since, it is fair to say that in Dracut, each time the town voted on the selectmen, the board was a newly formed “successor” board, whereas here, although the board evolves, it is never newly constituted. Moreover, where the agreement in Dracut involved labor negotiations, the contract in the instant case involves commitments to mitigate environmental damage. The issue presented in Dracut is, therefore, quite different from the one presented here, and that case provides little guidance.
The Duggan decision is similarly distinguishable. That case involved contracts for legal services entered into by the Taunton Municipal Light Plant Commission, an appointed board, which extended beyond the terms of a three-member commission whose members “must have known that a five-man commission (possibly with different views concerning counsel) would come into existence within a month or two.” Duggan v. City of Taunton, 360 Mass. 644, 649 (1971). The court held that the employment contracts for legal services were against public policy and should be denied enforcement against the successor board. Id. at 651-52.
The Duggan rule does not apply here because that decision rested on the well-settled principle, not at issue here, that persons (and municipal bodies) “in need of legal help shall have freedom to select an attorney [and] to change attorneys.” Id. at 649, citing, Walshv. O’Neill, 350 Mass. 586, 590 (1966). Thus, the public policy rationale in Duggan was limited to the at-will employment status of attorneys and has no relevance to the facts of this case. Indeed, the court in Duggan stated that it was not:
disposed to lay down any inflexible rule about contracts for attorney’s services made by municipal or other public boards for periods extending beyond the period when the board making the contract can control the actions of the board. Some such contracts made, pursuant to specific statutory authority or other authority, or made in good faith for particular and necessary services at an appropriate time and for reasonable compensation, may involve no substantial question of public policy and should be enforced. *658 Duggan, 360 Mass, at 651 (emphasis supplied).
B. Specific Performance
Under the Mitigation Agreement, the remedy available to AIR and Friends in the event of a default by Massport is quite limited: the Mitigation Agreement can be terminated or, in the case of a violation of Article II, relating to noise, traffic and air quality mitigation effects, AIR and Friends are entitled to seek specific enforcement. -[16] Massport argues that this specific enforcement provision serves to “lock in the prior [b]oard’s vision of the modernization program itself.” By way of example, Massport points out that the agreement requires it to “preserve a specific, mapped-out right-of-way for a ‘People Mover System’ ” and that “all Modernization Program projects be ‘compatible’ with the People Mover concept being planned when the Agreement was signed.” Massport argues that, even though it has developed a new people mover concept which it believes to be superior in terms of cost, efficiency, quality of service and environmental impacts, its hands are tied by the exclusive specific performance remedy in the agreement.
The argument is not persuasive. First, the parties are free to discuss the matter. The Mitigation Agreement contemplates situations where the parties will have disagreements and, for this reason, includes a provision for submitting any such disputes to mediation. See Mitigation Agreement, Article VII, Section C. As a practical matter, if Massport’s new people mover concept is in fact superior to the one identified in the agreement, the community parties would likely agree to modify the agreement to accommodate the improved plan. Second, even if the community parties were not amenable to modifying Massport’s obligations under the Mitigation Agreement, a court would not be likely to order specific performance of the obsolete design. A court can always decline to exercise its equitable powers of specific performance where a contract is “so hard and unreasonable . . . that enforcement of it would be oppressive to the defendant . . .” Chute v. Quincy, 156 Mass. 189, 191 (1892).
C. Timing of the Execution of the Agreement
Massport makes much of the fact that the Mitigation Agreement was entered into on the eve of a change in the majority of the board from Dukakis appointees to Weld appointees. The insinuation here, although Massport does not say so explicitly, is that the board as it existed on June 30, 1993 did not act in good faith when it bound Massport to a long-term contract that it knew would be of questionable popularity once the majority of the board shifted to Weld appointees.
Based on the undisputed facts, there is virtually no support for Massport’s intimations regarding the state of mind of the board that voted for the June 30, 1993 Mitigation Agreement. In the court’s view, the mere fact that the board executed the Mitigation Agreement on the eve of a shift in its political majority is not enough to invalidate the agreement. The historical context of the Mitigation Agreement reveals that it was duly negotiated over a substantial time period, that it was negotiated at arm’s length, and that it is consistent with statutory environmental imperatives (i.e., MEPA) that have dictated the direction of Massport’s mitigation efforts for years. The long history of community involvement in Massport’s mitigation process is detailed at length in the summary judgment record. In particular, Massport made a commitment to involve the community in its mitigation efforts as early as 1976 when it issued the Logan Airport Master Plan. Massport’s Final GEIR states that Massport had decided to include community groups in the mitigation process years before the agreement was actually signed. AIR and Friends were part of the Community Working Group established by Massport in 1991 that reviewed the mitigation measures in the 1991 Draft GEIR. According to the affidavit of AIR member Jean Riesman, AIR members began drafting a list of mitigation measures with their attorney Mr. Koff in contemplation of a contract with Massport early in 1992 and discussed a preliminary draft with Massport staff later that year. Although there may be some dispute as to the precise timing of the parties’ first discussions pertaining to the Mitigation Agreement, it is undisputed that by March of 1993, four months prior to the execution of the Mitigation Agreement, the parties were meeting at regular formal negotiation sessions to discuss the Mitigation Agreement.
In sum, under its enabling statute, the Massport board is a single continuous entity that enjoys broad powers to contract for a wide variety of purposes. The June 30, 1993 Mitigation Agreement is the product of a long history of negotiations between Massport and the representatives of the community that signed it, and the court sees nothing in the record to suggest that the agreement should be considered anything other than a valid and enforceable contract.
II. Plaintiffs did not Breach the Mitigation Agreement
Massport argues that, by sending letters to Environmental Affairs Secretary Trudy Coxe, AIR breached Article VI of the Mitigation Agreement which sets forth the obligations of the community parties. See Joint Appendix Q. Massport suggests that, at the very least, the letters raise a factual dispute with respect to AIR’s right under Article VI to send the letters. Massport did not provide the court with much specificity as to which portion(s) of the letters might place AIR in breach of the Mitigation Agreement. The court read the letters in question, and has determined that only those submitted by Attorney Koff on behalf of AIR could be the subject of Massport’s argument. After careful review, the court could not corroborate on its own Massport’s contention that a factual dispute lurks somewhere within the 36 pages of these letters. Moreover, even if the letters did present a factual dispute as to whether AIR was in breach of the Mitigation Agreement, nothing within the default clause of the Mitigation Agree *659 ment provides that it would be unenforceable with respect to the other signatories.
III. MEPA Claim
AIR and Friends claim that Massport’s commencement of an airside capacity enhancement study at Logan Airport prior to the filing of an environmental notification form (ENF) or EIR, is in violation of G.L.c. 30, §62C and 301 CMR 11.00. The court is not persuaded.
301 CMR 11.27(1)(B) expressly provides that “planning, design, policy development, setting of standards ... research, surveying and sampling, information gathering, evaluation, and giving of technical advice do not require an ENF.” Id. Nothing in the summary judgment record suggests that the study in question was anything more than an evaluation of the feasibility of potential airside improvements. Indeed, in her November 1, 1993 certificate on the FGEIR, the Secretary of Environmental Affairs wrote that she does “not believe that the initial, internal feasibility studies are subject to MEPA review.” The court defers to the agency’s interpretation of its own regulations. Summary judgment shall enter on count IV of the complaint in favor of Massport.
ORDER
For the foregoing reasons, the plaintiffs’ motion for partial summary judgment on counts I-III is ALLOWED. Judgment shall enter declaring that the June 30, 1993 Logan Airport Modernization Project Mitigation Agreement is a valid contract. Massport’s cross-motion for summary judgment on Counts I-III of the complaint is, accordingly, DENIED. The plaintiffs’ motion for summary judgment as to count IV of the complaint is DENIED. Massport’s cross-motion for summary judgment with respect to that claim is ALLOWED..
A status conference to discuss a schedule for disposing of the remaining issues in this case will be held on June 27, 1995 at 3:00 p.m.

The plaintiffs request that the granting of specific performance and any remaining issues, including any award of damages, attorneys fees and costs be disposed of after a trial on the merits. The court’s discussion of the plaintiffs motion for partial summary judgment on counts I-III is therefore limited to the legality of the Mitigation Agreement.

Both sides filed motions to strike certain affidavits in support of the summary judgment motions. Those motions are hereby denied. However, the court does not rely on any hearsay or incompetent statements contained in the challenged affidavits.

St. 1956, c. 465 provides in relevant part:
SECTION 2. Massachusetts Port Authority. — There is hereby created and placed in the department of public works a body politic and corporate to be known as the Massachusetts Port Authority . .. The Authority is hereby constituted a public instrumentality and the exercise by the Authority of the powers conferred by this act shall be deemed and held to be the performance of an essential governmental function.
The Authority shall consist of seven members all of whom shall be appointed by the governor by and with the advice and consent of the council and shall be residents of the commonwealth. Not more than four of such members shall be of the same political party . . . The members of the Authority first appointed shall continue in office for terms expiring on [successive] June thirtieth[s]... the term of each such member to be designated by the governor and to continue until his successor shall be duly appointed and qualified. The successor of each such member shall be appointed for a term of seven years and until his successor shall be duly appointed and qualified, except that any person appointed to fill a vacancy shall serve only for the unexpired term.
The governor shall designate one of the members as chairman of the Authority who shall serve as such chairman during his term of office as a member.
Four members of the Authority shall constitute a quorum and the affirmative vote of four members shall be necessary for any action taken by the Authority. No vacancy in the membership of the Authority shall impair the right of a quorum to exercise all the rights and perform all the duties of the Authority . . .

MEPA, enacted in 1972, requires that “[a]ll agencies, departments, commissions and authorities of the commonwealth shall review, evaluate, and determine the impact on the natural environment of all works, projects or activities conducted by them and shall use all practicable means and measures to minimize damage to the environment.” G.L.c. 30, §61.

In 1979, the Secretary of the Executive Office of Environmental Affairs acknowledged the scale, complexity, and im-portance of Logan Airport for purposes of state environmental impact assessment and review by requiring that Massport prepare a Generic Environmental Impact Report (GEIR) every three years to evaluate the cumulative effects of growth and change at the airport.

The Final GEIR is a comprehensive, one-and-a-half-inch-thick bound document. The list that follows is a mere outline of the mitigation commitments contained therein.

Pursuant to Massport’s By-Laws, Article 2, §4, and its Enabling Act, §2, “the affirmative vote of four members shall be necessary for any action taken by the Authority.”

In its opposition to plaintiffs’ motion for partial summary judgment Massport suggests that AIR did not have authority to execute the Mitigation Agreement because no quorum was present at the June 9, 1993 meeting. Massport only raised the issue by way of a footnote, however, and did not make the quorum issue part of its cross-motion for summary judgment. Accordingly, the court finds that the issue is not properly raised and does not bear further analysis in this decision. Moreover, even if AIR had not authorized execution of the Mitigation Agreement, that would not appear to affect Friends’ rights under the Mitigation Agreement.

The parties agree that Massport is not in default with respect to the following paragraphs of the mitigation agreement:
1. II.A. 3 (d)
2. II.B.l
3. II.B.3 (a)
4. II.B.5(e) and (f)
5. III.A.1, 3 and 4
6. IV(3)
7. VIII.C.

As to most of these contract breaches, the Mitigation Agreement provides that AIR and Friends have no judicial *660 remedy. The only judicial remedy is specific performance relating to Article II which deals with noise, traffic, and air quality mitigation steps.

It is worth noting that, notwithstanding its present attempt to invalidate the Mitigation Agreement because it improperly binds “future” Massport boards, Massport is negotiating a similar mitigation agreement with a number of community groups who negotiated the earlier agreement but did not sign it. (See Exhibit 1 to Plaintiffs’ memorandum in opposition to Massport’s cross-motion for summary judgment.) This second agreement is of somewhat shorter duration, but involves larger cash payments to the community than the first agreement. It is evident that Massport’s desire to extricate itself from the first Mitigation Agreement is motivated, at least in part, by pressure to deal with the dissident communiiy groups who refused to sign the first Mitigation Agreement because the terms were too favorable to Massport.

St. 1956, c. 465 provides as follows:
SECTION 3. General Grant of Powers. — -The Authority is hereby authorized and empowered—
(g) To extend, enlarge, improve, rehabilitate, lease as lessor or as lessee, maintain, repair and operate the projects under its control, and to establish rules and regulations for the use of any such project. . .
(o) To make and enter into all contracts and agreements necessary or incidental to the performance of its duties and the execution of its powers under this act.
(p) To do all acts and things necessary or convenient to carry out the powers expressly granted in this act.

Massport also raises the argument that the Mitigation Agreement is unenforceable as a matter of public policy because of its potential 17-year duration. It should be noted that Massport routinely enters into contracts of long duration. See e.g., Massport Appendix Exhibit F, “long-term agreements" (containing (1) Commonwealth Pier Lease which has a potential 99-year duration; (2) Ground Lease with Hoosac Pier for a 35-year term; (3) Ground Lease for Bird Island Flats Development which has an initial term of 30 years; and (4) long-term Sale/Mitigation Agreement with the Commonwealth Department of Public Works). The intent of the Legislature to empower the Massport board to enter contracts of extended duration is clear from the plain meaning of the provisions in section three of the Enabling Act, supra. Massport requires the power to enter such agreements if it is to plan effectively for the future.

And, to a lesser degree, two subsequent cases, Woburn Golf and Ski Auth’y v. Woburn Country Club, 365 Mass. 415 (1974) and White v. Board of Selectmen of Holbrook, 27 Mass.App.Ct. 1117(1989).

There is no provision allowing monetary damages other than attorneys fees. AIR and Friends have no express right under the Mitigation Agreement to judicial relief for breach of Articles III-IX of the Mitigation Agreement.