**In re 150 NORTH STREET ASSO-
CIATES LIMITED PART-
NERSHIP, Debtor.**

**150 NORTH STREET ASSOCIATES
LIMITED PARTNERSHIP,
Plaintiff,**

v.

**CITY OF PITTSFIELD, Defendant.**

**Bankruptcy No. 91–41168.
Adv. No. 94–4094.**

United States Bankruptcy Court,
D. Massachusetts.

July 13, 1995.

**2**

Louis S. Robin, Longmeadow, MA, for debtor.

Janet H. Pumphrey, Pittsfield, MA, for City of Pittsfield.

## MEMORANDUM OF DECISION

HENRY J. BOROFF, Bankruptcy Judge.

The issue before the Court arises from a complaint filed by the plaintiff, 150 North Street Associates Limited Partnership (the "Debtor" or "Plaintiff") against the defendant, the City of Pittsfield (the "City" or "Defendant") in which the Debtor seeks, pursuant to 11 U.S.C. § 505[1], to reduce the amount of real estate taxes assessed, and, to the extent necessary, refund real estate taxes previously paid on the Debtor's property located at 150 North Street, Pittsfield, Massachusetts (the "Property"). After a trial, the Court took the matter under advisement.

## I. INTRODUCTION

The Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code on May 7, 1991. The Debtor is the owner, manager and developer of a retail store/office building complex located at 150 North Street, Pittsfield, Massachusetts.

During the pendency of the case, the City of Pittsfield filed a proof of claim in the amount of $23,176.63 representing real estate taxes owed for the fiscal years 1990 and 1991.

---

**1.** Section 505 provides in relevant part:

(a)(1) Except as provided in paragraph (2) of this subsection, the court may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction [.]

(2) The court may not so determine—

(A) the amount or legality of a tax, fine, penalty, or addition to tax if such amount or legality was contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction before the commencement of the case under this title; or

(B) any right of the estate to a tax refund, before the earlier of—

(i) 120 days after the trustee properly requests such refund from the governmental unit from which such refund is claimed;

(ii) a determination by such governmental unit of such request.

11 U.S.C. § 505(a).

In order to provide adequate protection to the Debtor's mortgagee, the Debtor paid all post-petition interest payments on the real estate tax arrearages as well as the real estate taxes on a current basis. On April 7, 1994, the Debtor's Second Amended Plan of Reorganization (the "Plan") was confirmed. The Plan provided that the Debtor would pay the "tax priority claims regarding real estate and water/sewer taxes, to the extent that there are any, ... over a six (6) year period in equal monthly installments." The Plan also provided that "the Confirmed Debtor ... will reserve the right to bring an action against any taxing authority for the refund or adjustment of taxes."

On February 22, 1994, the Debtor filed the instant adversary proceeding seeking a reduction, or alternatively, a refund of real estate taxes owed on the Property for the fiscal years 1990, 1991, 1992, 1993, and 1994. The value of the Property was assessed by the City to be $1,739,640, $1,739,640, $1,492,-710, $705,900 and $441,190 in the fiscal years 1990, 1991, 1992, 1993 and 1994, respectively. Through its Complaint, the Debtor asserts that the fair market value of the Property for the fiscal years 1990, 1991, 1992, 1993, and 1994 was approximately $1,100,000, $960,000, $760,000, $360,000 and $170,000, respectively. The Debtor had previously requested and was granted abatements (without a hearing) for the fiscal years 1991, 1992 and 1993. However, the Debtor was unable to appeal the abatements because there were outstanding tax arrearages. *See* Mass.Gen.Laws Ann. ch. 59, § 64 (West 1989). The Debtor also filed an abatement request for the fiscal year 1994, but was denied the opportunity because the City alleged that the request was filed late.

On June 29, 1994, the City filed a "Motion Requesting Abstention, or, in the Alternative, for Summary Judgment" (the "Motion for Abstention") in which it argued that the Court should (1) abstain from hearing this proceeding pursuant to § 1334(c)(1), or alternatively, (2) enter summary judgment in favor of the City. After hearing the Motion for Abstention on August 24, 1994, the Court entered an order providing: "[m]otion for summary judgment allowed as to request for refund and denied as to request for set-off. Request for abstention denied."

At the trial on November 30, 1994, the Debtor withdrew its objection to the City's assessment of real estate taxes for the fiscal years 1988, 1989, 1992, 1993, and 1994. The Court then conducted a trial on the valuation of the Property for the fiscal years 1990 and 1991.[2] For purposes of the trial, the parties agreed that the important determinations were the values of the property as of January 1, 1989 (the operative date employed for the tax assessment for fiscal year 1990), and the value of the property as of January 1, 1990 (the operative date employed for the tax assessment for fiscal year 1991) (jointly, the "Relevant Dates"). After the trial, the Court ordered each party to submit a post-trial brief on issues pertaining to (1) which party carried the burden of proof in a tax abatement action filed under § 505, and (2) whether an offset awarded by the Court was limited in amount to the City's proof of claim for fiscal years 1990 and 1991.

## II. FINDINGS OF FACT

The following constitutes the Court's findings of fact pursuant to Fed.R.Bankr.P. 7052.

### A. The Debtor's Evidence

The Debtor produced two witnesses, consisting of (1) Raymond Real ("Real"), a real estate appraiser, and (2) Mory Brenner ("Brenner"), former general partner of the Debtor.

Real submitted an affidavit and appraisal representing his direct testimony on behalf of the Debtor. The appraisal sets forth his opinions of the market value of the Property

---

**2.** The assessed value of the Property in 1990 and 1991 was $1,739,640. The City of Pittsfield calculated the tax obligation on the Property to be $25,050.82 and $28,164.77 for fiscal years 1990 and 1991, respectively. The Debtor sought and obtained an abatement for fiscal year 1991. The assessed value of the Property (after abatement) was reduced to $1,492,710. The resulting tax abatement for fiscal year 1991 was $3,997.79.

as follows: $831,248 (fiscal year 1990); $936,864 (fiscal year 1991).[3]

Real exclusively utilized an income approach for appraising the Property on the Relevant Dates, employing the realized income and expenses for the years 1988 and 1989, respectively. Brenner testified that the Property, almost ninety (90) years old, was a heavy maintenance building. The building consisted of approximately 49,000 square feet with approximately 33,000 of net leasable space and approximately 35,000 square feet of common hallways, bathrooms, and other common areas which required substantial heat and light maintenance. Real's appraisal reflects that among other expenses, the maintenance and repair figures were $3,248 for fiscal year 1990, and $25,731 for fiscal year 1991. Also included in the expenses were the real estate taxes for fiscal years 1990 and 1991.

Real's appraisal modified the net operating income based on the projected market value of the leasable space in the immediate future. On the Relevant Dates, certain tenants enjoyed leases with a per square foot rent greater than that paid by other tenants. Real testified that it was the management's opinion that the larger rents exceeded market rent. Real testified that he therefore reduced the "overage" to reflect a more realistic market value of the Property. But Real provide almost no detail on how the market rate was determined.

To obtain the values for the Property, Real testified that he divided the net income by a capitalization rate of 12.5%, the same rent employed by the City of Springfield.

### B. The City's Evidence

The City relied on two appraisals prepared by John Weaver. Mr. Weaver was not available for cross-examination.[4]

The first Weaver appraisal, dated May 27, 1988, estimated that the fair market value of the property (based on completion of renovation and full occupancy by January 1, 1989) *would be* $2,240,000 as of January 1, 1989. (Brenner testified that the actual date of the completion of the renovation was November, 1990. As of January 1, 1989, only one-third of the Property was renovated). This appraisal was prepared in conjunction with financing a $1,590,000 mortgage on the Property. The City assumes a loan to value ratio of 80% of the purchase price, and, therefore, argues a value of approximately $1,987,500 as of January 1, 1989.[5]

The second Weaver appraisal, dated March 14, 1991, stated that the fair market value of the property was $960,000 as of January 1, 1990, for fiscal year 1991. Using the sales comparison approach, the appraisal utilized seven (7) alleged comparables ranging in value from $9.38 to $64.70 per square foot. The range was then narrowed by eliminating some of the comparables and averaging the price per square foot of two of the remaining comparables ($24.29 sq./ft.). The resulting fair market value was calculated by multiplying $24.29 sq./ft. by 49,000 sq. ft. for a total of $1,190,210. Unfortunately, the appraisal provides *no* explanation as to how the sales comparables actually compare to the subject Property and what adjustments might be necessary.

The City also relied on the testimony of Richard G. Bordeau ("Bordeau"), Chairman of the Assessors Office of the City of Pittsfield.

Bordeau testified that the City initially utilized the cost approach (adjusted by a methodology of sales comparisons) for the fiscal years 1990, 1991 and 1992.[6] The assessed value of the Property was $1,739,640

---

**3.** The values asserted by the Debtor would produce a reduction of taxes in the amount of $13,080.85 for the fiscal year 1990, and $8,999.07 for fiscal year 1991, for a total reduction of $22,079.92. In its post-trial memorandum, the Debtor asserts that these reductions are determined by (i) dividing the Debtor's valuation by the City's valuation, (ii) multiplying the resulting percentage by the taxes originally charged by the City of Springfield (which produces the amount that the Debtor believes should have been charged by the City), and (iii) subtracting this

resulting amount from the taxes assessed by the City.

**4.** The Weaver appraisals were admitted without objection.

**5.** The mortgage was later sold to an entity called the North Street 1993 Trust for $170,000.

**6.** In subsequent years, the City employed an income approach.

in both fiscal years 1990 and 1991. The City granted the Debtor's abatement request for fiscal year 1991 and assessed the value at $1,492,710. There was little explanation as to how the sales comparisons ultimately adjusted to the cost approach.

Bordeau criticized the Real appraisal. To normalize the maintenance expense per square foot, Bordeau had relied on the industry standard in Albany, New York, and employed a rate of 40 cents a square foot for maintenance and repairs. Real had not normalized expenses in the years he examined. Bordeau also complained about the Real methodology of determining the net income and capitalization rate. He argued that in order to employ the income approach, appraisers first estimate the gross income attributable to the real estate. The estimated gross income is obtained by adjusting the potential gross income for vacancy and credit losses. Expenses including management, salaries, utilities, supplies and materials, repairs and maintenance, property taxes, and insurance, are deducted from the estimated gross income to obtain the net income. Expenses not deducted for purposes of determining the net income for valuation purposes include depreciation, debt service, income taxes, capital improvements, and the owner's business expenses. The net income once properly determined is then capitalized by an appropriate capitalization rate. This rate is extracted from the market for similar properties or developed through a band of investment. For both fiscal years, the City's capitalization rate was (12.5%). The City's capitalization rate was formulated by *adding* the effective tax rate as a percentage to a discount rate. Bordeau testified that Real improperly accounted for the real estate taxes in his appraisal by utilizing the City's capitalization rate already loaded with the effective tax rate and then expensing the real estate taxes again in determining net income. This "double-dipping" deflated the appraised value of the Property. Bordeau testified that if Real had not utilized a capitalization rate loaded with the effective tax rate (that is, 1.44%), Real's capitalization rate would have been approximately 11%. The lower capitalization rate would have increased the values of the Property to approximately 1,010,452 and 1,321,637 for fiscal years 1990 and 1991, respectively. This Court agrees with the criticisms offered by Bordeau.

## III. *DISCUSSION*

The reported decisions in this district uniformly recognize the bankruptcy court's jurisdiction under § 505(a) of the Bankruptcy Code to determine a debtor's tax liability. *See Cumberland Farms, Inc. v. Town of Barnstable (In re Cumberland Farms, Inc.),* 175 B.R. 138 (Bankr.D.Mass.1994); *In re St. John's Nursing Home, Inc.,* 154 B.R. 117 (Bankr.D.Mass.1993), *aff'd,* 169 B.R. 795 (D.Mass.1994); *Ledgemere Land Corp. v. Town of Ashland (In re Ledgemere Land Corp.),* 135 B.R. 193 (Bankr.D.Mass.1991).

However, § 505(a)(2) sets forth two limitations on that court's jurisdiction. Section 505(a)(2)(A) limits the bankruptcy court's power to determine the tax liability if the amount was contested or adjudicated by a judicial or administrative tribunal of competent jurisdiction prior to the commencement of the case. 11 U.S.C. § 505(a)(2)(A). Section 505(a)(2)(B) limits the bankruptcy court's jurisdiction to adjudicate certain claims for refund of real estate taxes. *See Cumberland Farms, Inc.,* 175 B.R. at 142. *St. John's Nursing Home, Inc.,* 154 B.R. at 120.

 These limitations are not applicable to the instant proceeding. First, although the Debtor sought and obtained an abatement from the City for fiscal year 1991, it was not given a hearing and was unable to appeal the decision because of the outstanding tax arrearages. Therefore, the tax liability for fiscal year 1991 was not "adjudicated" for the purposes of § 505(a)(2)(A). *See Ledgemere Land Corp.,* 135 B.R. at 197. Second, the Debtor's failure to seek an abatement for the fiscal year 1990 does not bar the Debtor from seeking an adjudication in the bankruptcy court under § 505(a)(2)(A). *See Id.* at 196. Third, for purposes of § 505(a)(2)(B), the Debtor is not seeking a

"refund" on taxes paid prepetition.[7] Instead, the Debtor is seeking a reduction of the City's claim for real estate taxes for the fiscal years 1990 and 1991.

Since the conclusion of the instant trial, Bankruptcy Judge James F. Queenan, Jr. issued *Cumberland Farms, Inc.*, 175 B.R. 138. In that case, the court examined the scope of the bankruptcy court's authority to adjudicate a debtor's request for refund and reduction of real estate taxes under § 505. Following in part the *St. John's* decisions, Judge Queenan interpreted § 505(a)(2)(B) to prohibit the bankruptcy court from adjudicating refund claims. *Cumberland Farms, Inc.*, 175 B.R. at 142. The court also held that § 505 did not limit the bankruptcy court's authority to adjudicate reductions of unpaid real estate tax claims. *Id.* However, Judge Queenan abstained from resolving the disputes over unpaid taxes because he found that in the *Cumberland Farms* case, there would be little or no potential benefit to the estate. *Id.* at 143.

While this Court truly agrees with the reasoning set forth in the *Cumberland Farms* decision, this Court feels it is inappropriate to revisit the propriety of abstaining from the adjudication of the instant tax dispute. This Court previously declined the City's request for abstention under § 1334(c)(1). Although the order was interlocutory, and not technically binding on the Court, the "law of the case" doctrine governs the issue of whether the court may reconsider an interlocutory order. *See Connecticut Nat'l Bank v. Panaia (In re Panaia)*, 65 B.R. 865, 868 (Bankr.D.Mass.1986).

The "law of the case" doctrine advises that a court should not reconsider a prior ruling unless the following exceptional circumstances exist: (1) evidence on a subsequent trial was substantially different; (2) controlling authority has since made a contrary decision of law applicable to such issues, or (3) the decision was clearly erroneous and would work a manifest injustice. *United States v. Rivera–Martinez*, 931 F.2d

148, 151 (1st Cir.1991), *cert. denied*, 502 U.S. 862, 112 S.Ct. 184, 116 L.Ed.2d 145 (1991). *See also White v. Higgins*, 116 F.2d 312, 317 (1st Cir.1940); *In re Panaia*, 65 B.R. at 868. None of these factors exist in the instant case. Since there are no exceptional circumstances in this case, this Court shall not exercise its discretion to reconsider its prior ruling on abstention in the present case and will go on to decide the case.

However, deciding this case is particularly difficult. Much of the evidence proffered by the parties was irrelevant, incomplete or impeached.

It is well understood that there are three (3) recognized methodologies for valuing real estate. By the cost approach, the appraised value typically reflects the reproduction cost or the replacement cost of the subject property. The sales comparison approach relies on recent comparable sales. Those sales prices are then adjusted by the degree to which those properties differ from the subject property. By the income approach, the net operating income of the property (gross income less the expenses) is divided by a capitalization rate to obtain the fair market value of the property. Because the cost approach rarely provides an accurate reading of the fair market value of real estate, appraisals routinely disregard it or mention it only in passing, and concentrate their efforts on the sales comparison and income approaches and then adjust for any differences between the two.

Unfortunately, neither of the parties was able to submit appraisals providing meaningful input into the fair market value of the Property on the Relevant Dates. The Debtor's appraisal employs only the income approach and disregards entirely the sales comparison approach, thereby denying the Court any opportunity to test its validity under real world market conditions. It discounts a history of actual rental income by real tenants to get to its view of the market rent, but does not fully explain how it determined the mar-

---

7. The Court rejects the City's contention that the Debtor is actually seeking a refund for real estate taxes covering fiscal years 1990 and 1991. Notwithstanding the fact that the Debtor has made almost all payments for past due taxes and currently owes only $1,015.86 (as of the date of the trial), these payments were made post-petition.

ket rent, other than to vaguely reference what market rent should have been. Finally, it expenses the real estate taxes and relies on a capitalization rate that is already loaded with a tax factor. This "double-dipping" accounts for a sizable difference in the valuation. If the appraisal was flawed in only one respect, the Court could make an appropriate adjustment. However, with all of these flaws, the Court can not make an adjustment without guessing or creating evidence. And, without the sales comparisons, the Court could not even determine whether its guess was anywhere close to reality.

The City's evidence also suffers from serious problems. The 1988 Weaver appraisal is totally irrelevant. It is nothing more than a projection. A projection should not be confused with an appraisal. And, even if that appraisal were probative, the City's suggestion that the Court should deem relevant the granting of a mortgage loan by some lender at 80% of that mortgagee's determination of projected value is too substantial a leap. The 1991 Weaver appraisal is also problematic. It is a sales comparison approach only, but lists comparisons without indicating how they compare to the Property. Without examining adjusting factors (size, age, quality, condition, usage type, location, etc.), the comparisons are of absolutely no value. Therefore, the appraisal has little value.

In view of the foregoing, notwithstanding the best efforts of counsel, neither of the parties have produced substantial probative evidence of the value of the property on the Relevant Dates. Therefore, this Court must reexamine the burdens of each party coming into the case.

Since the context of this dispute arose as an adversary proceeding under § 505, the Debtor arguably carries the burden of proof and the burden of persuasion on the issue of valuation of the Property. *Cf. United States v. Walters (In re Walters)*, 176 B.R. 835, 870 (Bankr.N.D.Ind.1994) ("[I]n the context of a § 505(a) motion by the IRS to determine the tax liability of a debtor, as opposed to the objection by the debtor or trustee to a claim of the IRS versus the Debtor's estate ... the debtors bear the burden of production and persuasion.") However, through the instant complaint, the Debtor is effectively seeking a reduction of the proof of claim filed by the City for fiscal years 1990 and 1991. Therefore, arguably, the Debtor has simply objected to a proof of claim.

It is well settled that a properly executed proof of claim constitutes prima facie evidence of the validity of the claim. 11 U.S.C. § 502(a); Fed.R.Bankr.P. 3001(f). The objecting party has the initial burden of going forward with evidence establishing the basis of the objection. 3 COLLIER ON BANKRUPTCY, § 502.01[3] (15th ed. 1995). If the objecting party succeeds in overcoming the prima facie case, the claimant then has the burden of persuasion to prove the validity of the claim by a preponderance of the evidence. *Id.*

This Court need not determine who has the burden of persuasion, because irrespective of how the action is characterized, the burden of production rests with the Debtor.

In order to carry the burden of production, that party must introduce sufficient evidence to make out a prima facie case. One commentator has stated:

> A party carries the burden of production by introducing evidence sufficient to support the findings of fact that are necessary if she is to prevail.... Success in carrying the burden of production assures her that her case is strong enough to be considered on the merits by the trier of fact, and it is often said that she has made out a "prima facie case." Failing to carry the production burden means essentially the opposite, and she may lose summarily.

Christopher B. Mueller, Laird C. Kirkpatrick, *Federal Evidence* § 64 at 317 (2d ed. 1994).

The Debtor has not met its burden of production. The Debtor relies on an appraisal that has very little probative value. First, Real's appraisal exclusively uses the income approach for valuation of the Property, without any verification by utilizing the cost and sales comparison approaches. Second, Real discounted the actual rental income to reflect what the market income would be

for the Property for fiscal years 1990 and 1991 without fully explaining how the market was identified. Third, Real's reliance on the City's capitalization rate, without either eliminating the tax factor, or increasing the net income by adding back the real estate taxes, inappropriately lowers the valuation of the Property.

In summary, the Debtor failed to introduce evidence sufficient to establish a prima facie case.

## IV. CONCLUSION

In view of the foregoing, the Court finds that the Debtor has failed to sustain its burden of production to establish a prima facie case under § 505. The Court hereby awards judgment in favor of the City on the Complaint. A separate judgment shall issue in conformity with this memorandum of decision.