**In re BANK OF NEW ENGLAND CORPORATION, Debtor.**

**Lacy D. NEWMAN, Plaintiff,**

v.

**BANK OF NEW ENGLAND CORPORATION, Defendant.**

**Bankruptcy No. 91–10126–WCH.
Adv. No. 92–1317.**

United States Bankruptcy Court, D. Massachusetts.

Oct. 17, 1995.

James Donnell, Robin Russell, Andrews & Kurth L.L.P., Houston, Texas, for trustee.

George F. Parker, III, Badger, Dolan, Parker & Cohen, Boston, Massachusetts, for Lacy G. Newman.

## DECISION

WILLIAM C. HILLMAN, Bankruptcy Judge.

Lacy G. Newman ("Newman") commenced this adversary proceeding to recover from Bank of New England Corporation ("BNEC") funds held in an escrow account which represent amounts to which he claims he became entitled when BNEC terminated his position for reasons other than cause. He asks that I determine his entitlement to recovery and the validity, extent and priority of his lien upon the escrow funds. *See* Fed. R.Bankr.P. 7001(2), (9).[1]

I previously had granted summary judgment for BNEC. On appeal the United States District Court reversed the decision[2] as will be discussed below.

---

1. Newman also filed a proof of claim for the same sum, to which BNEC objected. Since this adversary proceeding contains "a demand for relief of the kind specified in Rule 7001," I consider the claim and objection to be joined and controlled by the present decision. Fed. R.Bankr.P. 3007.

2. *Newman v. Bank of New England Corp.*, C.A. No. 93–12209–Y (D.Mass.), Memorandum and Order of December 29, 1993. ("Young Memo").

Upon remand I held a trial and took the matter under advisement.

### General Findings of Fact

Prior to his employment with BNEC, Newman had been employed in commercial banking for a number of years and at several different banks. In May of 1990, BNEC orally agreed to hire Newman as a Senior Vice President. During the pre-employment negotiations Newman and BNEC agreed on many conditions of his employment, including an annual salary of $225,000 for a two year period. At the time of the offer, however, the parties had not reached an agreement on the structuring of Newman's severance benefits.

Newman had two requirements for his severance package. First, because of his experience with a previous employer, Newman wanted his severance package to be secured so that if the BNEC's subsidiary banks ("the Banks") were taken by a regulator and put in receivership, he nevertheless would be able to receive his benefits. Second, Newman requested an "evergreen" package which would pay him an amount equal to his annual salary whenever he might be terminated.

On June 7, 1990, Steven E. Wheeler ("Wheeler"), Newman's boss, sent a memorandum to the Chief Executive Officer of BNEC, Lawrence Fish ("Fish"). Wheeler expressed his concern that the bank regulators would not accept a secured compensation position to be granted to a member of senior management. He proposed an alternative for Newman's severance package, a "signing bonus". On June 12, 1990, Wheeler sent another memorandum to Fish indicating that Newman would report to work under the assumption that the bank regulators would approve and adopt either the secured package or the "signing bonus" alternative.

On June 18, 1990, without a written employment agreement, Newman began working for BNEC. Newman anticipated, however, that the manner in which the severance package would be structured would be resolved within a matter of weeks. Over the next several months, Newman and BNEC considered various severance packages, which varied as to amount and term. Newman met exclusively with Wheeler until the beginning of August when he contacted William W. Abendroth ("Abendroth"), senior counsel at BNEC.

On August 22, 1990, after a meeting with Newman, Abendroth discussed the potential structure of the severance package with Mary Scatamacchia ("Scatamacchia"), a BNEC human resources employee. Scatamacchia proposed definitions, changes, and her professional opinion to Abendroth. Abendroth also asked Wheeler for assistance because he had never drafted an employee agreement and was unfamiliar with the applicable banking regulations.

Newman and Abendroth continued to meet and Newman saw drafts of the severance package. They worked together on the "example" which demonstrated the computation of severance pay that later appeared in the final draft. Abendroth made changes to the severance package and sent a rough draft of the document to the proposed escrow agents in September. Abendroth recalled no significant changes in the severance package from the mailed draft to its final form.

On November, 1, 1990, Newman and BNEC signed a two-year written employment agreement and an escrow agreement. The employment agreement was backdated to June 18, 1990, the day Newman's tenure commenced. The employment agreement enabled Newman to collect a "signing bonus," upon being terminated from his position. The "signing bonus" of $225,000 would be reduced by approximately $18,000 per month after the first year.

The employment agreement also included an escrow agreement to secure the payment of the "signing bonus." It was dated November 1, 1990, attached as an exhibit to the employment agreement, and required BNEC to deposit three $75,000 certificates of deposit with an escrow agent. Upon termination Newman would was required to make demand upon the escrow agent to obtain payment.

On January 7, 1991, fewer than 90 days after the date of the escrow agreement and the delivery of the certificates of deposit to the escrow agent, BNEC filed for Chapter 7 bankruptcy relief.

On January 18, 1991 Newman wrote to the escrow agent and demanded payment. On January 22, 1991 the escrow agent informed the interim trustee of BNEC of Newman's demand. Recognizing that BNEC's obligation·to Newman stemmed from the employment agreement dated June 18, 1990, and the escrow agreement dated November 1, 1990, the trustee believed that the agreement was a voidable preference on account of an antecedent debt under 11 U.S.C. § 547(b)(2).

The escrow agent continues to hold the funds.

Further findings of fact will appear as relevant to the particular issues discussed below.

### Discussion

The issues have been narrowed to the following:

A. Was the creation and funding of the escrow a preference?

B. Has the condition precedent to Newman's right to draw on the escrow transpired?

C. Has Newman violated the employment agreement to the extent that he should not be permitted to receive payment under it?

D. Is Newman's claim limited by 11 U.S.C. § 502(b)(7)?

E. Is Newman entitled to interest on his claim?

*A. Was the creation and funding of the escrow a preference?*

█ A preference is a transfer of a debtor's interest in property

"(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title."

11 U.S.C. § 547(b).

Newman admits that the creation of the escrow satisfies all of the elements of the section except one. He contends that his employment agreement was not settled until he signed the employment agreement on November 1, 1990, the same day his severance money was transferred into an escrow account, and hence the transfer could not be a preference because there was no antecedent debt. Moreover, even if it were found to be a preference, it constituted a contemporaneous exchange which excepts it from avoidance as a preference under 11 U.S.C. § 547(c)(1).[3]

Newman argues that the payment into escrow was not on account of an antecedent debt because circumstances demonstrate that the terms of the agreement were not final until November of 1990. Although the severance package he and BNEC discussed in May of 1990 contained similarities to the proposed drafts and to the one he eventually signed, the differences were substantial. Some of the differences from the May discussions include BNEC being able to choose to renew the employment agreement after one year and a continual monetary reduction in the second year. In the final agreement, Newman could potentially receive only $18,000 if his position were terminated at the end of the second year.

---

**3.** "(c) The trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made

to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange...."

BNEC's position is that its obligation to Newman arose when he began to work for it on June 18, 1990, and therefore that the establishment of the escrow was for an antecedent debt. BNEC contends that Newman had agreed orally in May 1990 to all the conditions of employment, including a secured severance package. According to BNEC, the severance package merely had to be tailored by BNEC's senior management and legal department to comply with the relevant banking regulations.

Judge Young's Memorandum and Order reversing my order granting summary judgment shapes the discussion which follows:

> "To determine whether the ... transfer was 'on account of an antecedent debt,' the Court must determine when the Bank's obligation to Newman as to the severance agreement became 'clear enough for the court to enforce the agreement as a final expression of the parties' intention.' *Harvey Probber, Inc. v. Voko Franz Vogt & Co.,* 50 B.R. 292, 297 (Bankr.D.Mass.1985). Even assuming arguendo that Newman and [BNEC] agreed as to the amount of the severance benefit at the time Newman's employment began in June, 1990, without any agreement as to the essential terms and conditions under which Newman would become entitled to severance benefits and the structure that the benefit would take, [BNEC's] obligation would not be clear enough for the court to enforce. "Here the Record on Appeal reveals that a disputed issue of material fact exists as to when [BNEC] and Newman agreed to the structure of Newman's severance benefits....
>
> "In light of the constantly changing nature of the severance agreement on the record before the Court, it is not possible to determine whether the Agreement become so sufficiently definite as to be enforceable at any time before November 1, 1990 when the Agreement was actually signed."

Young Memo at 4–5.

It would be possible to conclude from Judge Young's last paragraph, which does establish the law of the case, *150 North St. Assoc. L.P. v. Pittsfield (In re 150 North St. Assoc. L.P.),* 184 B.R. 1, 6 (Bankr.D.Mass.

1995), that Newman must prevail on this issue. Even if Judge Young has not precluded further discussion and determination of the point, the case law and facts support the same conclusion.

■ Under Massachusetts law, parties are not contractually obligated to one another until their negotiations result in a definite agreement. *Cataldo v. Continental Insurance Company (In re Data Concepts International, Inc.),* 73 B.R. 406, 412 (Bankr. D.Mass.1987). *See also Sibley v. Felton,* 156 Mass. 273, 276, 31 N.E. 10 (1892) (no contract if no agreement on essential elements). I must determine when the employment contract was "clear enough for the court to enforce the agreement as a final expression of the parties' intention." *Harvey Probber, Inc. v. Voko Franz Vogt & Co., supra* at 297.

As explained above, Newman sought a written secured severance package. As of May 1990, BNEC's management told Newman that he would have a secured severance package if he came to work for BNEC. Nevertheless, he thought that an oral severance contract existed to the extent that, if he were fired by BNEC before the employee agreement were written, he would have attempted to obtain his severance package.

Within a five day span, from June 7 to June 12, 1990, Wheeler twice altered significantly Newman's severance package from the proposed original plan of May. These two plans proposed in a memorandum to Fish differ greatly from both the May "evergreen" plan and the package agreed upon and signed in November.

Because Abendroth had neither previously written an employee or severance agreement nor understood the applicable banking regulations, he struggled to draft a final document. Abendroth and Newman together decided to include an example of how the severance package might work because they felt the wording alone would not be sufficient. Abendroth, Newman, Wheeler, and Scatamacchia all contacted each other intermittently to discuss or draft the severance package during the four month period up until the employee agreement was signed. New-

man had seen numerous drafts of his employee agreement before signing it in November.

Because of the importance which Newman placed on a secured severance package and the lengthy negotiations which the parties endured to realize an acceptable plan, I find that there was no definite agreement until November 1, 1990.

While the numerous discussions and drafts were not sufficiently definite as to establish a contract, the desire of both parties to complete a written employment document indicates that the written document alone should be considered the binding agreement. Normally the fact that the parties contemplate the execution of a final written agreement justifies a strong inference that the parties do not intend to be bound by earlier negotiations or agreements until the final terms are settled. *Rosenfield v. United States Trust Co.*, 290 Mass. 210, 216, 195 N.E. 323, 325 (1935); *Wilcox, Inc. v. Shell Eastern Petroleum Products, Inc.*, 283 Mass. 383, 387, 186 N.E. 562, 563–64 (1933).

The written agreement of November 1, 1990 established a contract for which the payment of the certificates of deposit into escrow was a substantially contemporaneous exchange, not an antecedent debt, and hence not a preference.

*B. Has the condition precedent to Newman's right to draw on the escrow transpired?*

■ Newman is entitled to recovery under the contract BNEC terminated him and the termination was not for cause. There is no suggestion that the severance of the relationship between Newman and BNEC was "for cause" and I find as a fact that there was no cause. The issue therefore is narrowed to whether BNEC terminated Newman's employment or Newman left voluntarily.

On January 7, 1991, FDIC seized the Banks and BNEC filed for relief under Chapter 7 of the Bankruptcy Code. At that time, the employees of BNEC were "transferred" to New Bank of New England, N.A., a "bridge bank" created by FDIC as part of the seizure process. ("New Bank"). New Bank is not an affiliate, a subsidiary, or controlled by BNEC.

Newman continued performing the same type of work for the same superiors. Unbeknowst to him at that time, he was working for a wholly owned subsidiary of the New Bank called BNEC Services Corp. ("Services Corp."). Around the middle of January, Wheeler informed Newman that all the employees of BNEC had been reassigned to the New Bank. Ralph Gordon ("Gordon"), who was the head of human resources at BNEC, had similar responsibilities at the New Bank. Newman approached Gordon a day or two after speaking with Wheeler. Newman asked Gordon if the New Bank intended to assume Newman's contract, and Gordon informed Newman that the New Bank had no such intentions.

The Trustee of BNEC did not assume Newman's contract, and BNEC did not cause any other entity to assume it. BNEC stopped paying Newman as of January 6, 1991, and he was paid at various times by Services Corp., the New Bank, and Fleet National Bank (to which FDIC transferred substantial assets of the Banks). Newman never entered into an agreement with any other entity and he did not waive his agreement with BNEC. He never offered his services to the Trustee. The Trustee knew that Newman was not working for him.

The employment contract provides that Newman was entitled to the funds in the escrow account if "during the Employment period, (a) Executive's [Newman's] employment with the Company or with a successor in interest (including any person or entity serving as receiver, trustee, or in a similar capacity) shall be terminated". It also states that "if the Executive terminates employment during the Employment Period, this Agreement shall terminate without further obligations to the Executive". There is no explication of "termination".

It is manifest that once FDIC had taken control of the assets of the Banks, the services which Newman had been engaged to perform were no longer required by BNEC. Does that fact constitute a termination? While the parties have offered no case authority, and I have found none in my own

research, there is a close parallel in the common law cases involving permanent or lifetime employment.

The genesis of the modern cases appears to be *Carnig v. Carr,* 167 Mass. 544, 46 N.E. 117 (1897), and the principle enunciated there is alive and well. *See, e.g., Stevens v. G.L. Rugo & Sons., Inc.,* 209 F.2d 135, 137 (1st Cir.1954).

In *Carnig,* the defendant agreed to employ the plaintiff permanently. The defendant subsequently informed the plaintiff that defendant was moving his business and plaintiff's services were no longer required. Plaintiff sued for breach of contract.

The Supreme Judicial Court resorted to external circumstances to determine the meaning of the phrase:

> "To ascertain what the parties intended by 'permanent employment' it is necessary to consider the circumstances surrounding the making of the contract, its subject, the situation and relation of the parties, and the sense in which, taking these things into account, the words would be commonly understood, for it fairly may be assumed that the parties used and understood them in that sense."

167 Mass. at 547, 46 N.E. 117.

The Court concluded that

> "So long as defendant was engaged in enameling and had work the plaintiff could do and desired to do, and so long as the plaintiff was able to do his work satisfactorily, the defendant would employ him."

*Id.*

It reiterated the principal in *Phelps v. Shawprint, Inc.,* 328 Mass. 352, 355, 103 N.E.2d 687 (1952): "Doubtless, such a contract will terminate if the employer in good faith quits the business; in other words, he is liable only so long as he conducts the business even if the employee is able and willing to perform his duties".

Considering especially Newman's motivation in insisting upon a secured severance package, these precedents are applicable in the present case. I find as a matter of law that the termination of BNEC's banking operations constituted a termination of New-man's employment contract. The termination triggered Newman's right to draw upon the escrowed funds. The date of termination is the date upon which the Banks were taken by FDIC, January 7, 1991.

The facts upon which Newman bases his claim of termination are earlier in time than those upon which BNEC relies. Having found a termination by BNEC, it is not necessary to consider Newman's subsequent actions.

*C. Has Newman violated the employment agreement to the extent that he should not be permitted to receive payment under it?*

BNEC makes this argument in a cursory fashion and did not brief it nor offer any significant evidence supporting it. I find the position to be without merit in law and unsupported by the facts.

*D. Is Newman's claim limited by 11 U.S.C. § 502(b)(7)?*

The contract provides a schedule of payments to be made to Newman if his employment is terminated, labeled "Date of Termination/Payment to Executive". Since I have found that Newman was terminated by BNEC and that termination occurred prior to July 18, 1991, the scheduled payment is "$225,000 plus all interest earned [on the escrow account] to date of termination." *Id.*

■ I find no basis *in the contract* for Newman's assertion that he is entitled to the escrow fund "with all earned interest thereon." *Plaintiff's Trial Memorandum* at 26. The interest to which Newman has a claim *in the contract* is only the amount earned on the escrowed funds between the date of deposit on November 1, 1990 and the date of termination, which I have found to be January 7, 1991.

The initial investment of the escrow fund was in three $75,000 certificates of deposit bearing the following interest rates, which I have averaged:

| | |
|---|---|
| Bank of New England | 8.1500% |
| Maine National Bank | 8.0000% |
| Connecticut Bank & Trust Co. | 8.2000% |
| Average rate | 8.1167% |

The period of employment while the escrow was funded was 68 days. Computing the average rate for 68 days on $225,000 demonstrates that amount of interest to which Newman would be entitled *under the contract* is $3,402.34.

■ BNEC contends that Newman's claim must be limited to "the compensation provided by such contract, without acceleration, for one year." 11 U.S.C. § 502(b)(7)(A). That amount would be $225,000. Newman contends that § 502 is inapplicable because "Section 502 deals with claims under Section 501. It does not purport to deal with secured claims pursued by way of Adversarial Proceedings, for property belonging to Newman." *Plaintiff's Trial Memorandum* at 26.

That argument might have carried some weight if Newman had not filed a proof of claim. There was no need for him to do so if, as he asserts, he is a secured creditor. Only an "unsecured creditor or an equity security holder must file a proof of claim or interest," with certain exceptions not relevant here. Fed.R.Bankr.P. 3002(a). The Advisory Committee Note to that rule provides specifically that "a secured claim need not be filed or allowed under § 502 or § 506(d)" but then adds "unless a party in interest has requested a determination and allowance or disallowance under § 502."

Newman did file a proof of claim on June 19, 1991. He filed this adversary proceeding on May 12, 1992.

> "A claim or interest, proof of which is filed under this title is deemed allowed, unless a party in interest ... objects."

11 U.S.C. § 502(a).

A party in interest, the debtor, did in fact object to Newman's claim. *Trustee's First Omnibus Objection to Claims,* Docket No. 784, filed September 9, 1994. I must therefore "determine the amount of such claim ... as of the date of the filing of the petition." 11 U.S.C. § 502(b). The claim shall be allowed

> "except to the extent that—
>
> " ...
>
> "(7) if such claim is the claim of an employee for damages resulting from the termination of an employment contract, such claim exceeds—
>
> (A) the compensation provided by such contract, without acceleration, for one year following the earlier of—
>
> (i) the date of the filing of the petition; or
>
> (ii) the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract...."

11 U.S.C. § 502(b)(7).

Initially I find as a matter of law that Newman's claim is "the claim of an employee for damages resulting from the termination of an employment contract", to quote 11 U.S.C. § 502(b)(7). *See In re CPT Corp.,* 1991 WL 255679 (Bankr.D.Minn.1991) and cases cited. It would be difficult to describe it otherwise. As a result, his allowed secured claim is limited to $225,000 under § 502.

However, the escrow fund exceeds the allowed amount of the claim. In this context § 502(b)(7) is supplemented by § 506(b):

> "To the extent that an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose."

The "interest on such claim ... provided for under the agreement" consists of two elements. The first is the sum of $3,402.34, computed as above.

The second is BNEC's responsibility for costs and additional interest under ¶ 8 of the agreement:

> "The Company [BNEC] agrees to pay, to the full extent permitted by law, all legal fees and expenses which the Executive [Newman] may reasonably incur as a result of any contest (regardless of the outcome thereof) by the Company or others of the validity or enforceability of, or liability under, any provision of this Agreement or any guarantee of performance thereof, plus in each case interest at the applicable Federal rate provided for in Section 7872(f)(2)

of the Internal Revenue Code of 1986, as amended (the "Code")."

Interest at the contract rate should be calculated from the date of demand on the escrow agent, January 18, 1991.

I have no evidence as to the present balance in the escrow fund and I do not know the extent of counsel fees incurred by Newman. I cannot enter an order at this time. If the parties can agree upon the amounts payable to Newman, counsel for Newman may propose appropriate orders both as to the claim and objection and the adversary proceeding pursuant to Local Rule 43(A). In the absence of such agreement filed by November 16, 1995 I will schedule an evidentiary hearing to make the necessary determinations.